**UNITED STATES of America, Plaintiff,**

v.

**Michael J. SWANSON, D.O., Defendant.**

**Civ. No. 84–2985–DT.**

United States District Court,
E.D. Michigan, S.D.

Sept. 30, 1985.

Karl Overman, Asst. U.S. Atty., Detroit, Mich., for plaintiff.

Alan Gilchrist, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

This matter is presently before the Court on a motion for summary judgment by the United States to recover triple damages plus interest for an alleged breach of contract by Defendant, Michael J. Swanson, D.O., a recipient of scholarship funds under the National Health Service Corps Scholarship Program, 42 U.S.C. § 254*l*. Plaintiff contends that Defendant breached his contract with the government by failing to begin his service obligation in the Public Health Service Corps.

Defendant contends that numerous affirmative defenses raised in this action for breach of contract render summary judgment inappropriate. The Defendant basically contends that the government, through its agent, misrepresented that he could obtain a deferment from his service obligation to pursue a surgical residency, and that the government should now be estopped from denying such representation. Defendant also claims that the contract was unconscionable and that the liquidated damage provision of the contract operates as a penalty and consequently is unenforceable. Further, Defendant contends that his due process rights were violated as he was not afforded a hearing prior to termination of government benefits to which he was entitled and before imposition of civil money damages. Defendant also contends that the written contract with the government was orally modified by an agent to provide that surgery would be a deferrable residency. Finally, Defendant contends that the Secretary acted contrary to the regulations governing operation of the scholarship program in refusing Defendant a waiver or suspension of his service obligation or payment under the scholarship program.

## I. BACKGROUND

The scholarship program in question was established by Congress as part of a comprehensive legislative effort to rectify the shortage of health resources in the area of primary health care services for urban and

rural medically underserved populations in the United States. *See* House Report 94–266, 94th Cong. 1st Sess., p. 22 (1975); Senate Report 94–998, 94th Cong. 1st Sess., pp. 48–54 (1975), U.S.Code Cong. & Admin. News 1976, 4947, 4964.

Pursuant to such a scholarship program administered by the Secretary of Health and Human Services, scholarships are provided to eligible students in professional health degree programs who, according to a written contract, agree to serve upon the completion of their training a "period of obligated service" in exchange for receipt of scholarship funds. 42 U.S.C. § 254*l*.

Eligibility for and the conditions upon which a scholarship is awarded under the NHSC program are clearly and succinctly outlined in the statute.

### Eligibility; application; written contract

(b) To be eligible to participate in the Scholarship Program, an individual must—

"(1) be accepted for enrollment, or be enrolled, as a full-time student (A) in an accredited (as determined by the Secretary) educational institution in a State and (B) in a course of study or program, offered by such institution and approved by the Secretary, leading to a degree in medicine, osteopathy, dentistry, or other health profession;

(2) be eligible for, or hold, an appointment as a commissioned officer in the Regular or Reserve Corps of the Service or be eligible for selection for civilian service in the Corps;

(3) submit an application to participate in the Scholarship Program; and

(4) sign and submit to the Secretary, at the time of submittal of such application, a written contract (described in subsection (f) of this section) to accept payment of a scholarship and to serve (in accordance with this subpart) for the applicable period of obligated service in a health manpower shortage area.

42 U.S.C. § 254*l* (b).

The terms of the written contract signed by each applicant for such a scholarship are established by statute, 42 U.S.C. § 254f. The essence of such a contract requires the recipient of scholarship funds to perform one year of obligated service in the full-time clinical practice of his or her profession for each school year for which the applicant was provided a scholarship for a minimum of two years, as a member of the National Health Service Corps [1] in a health manpower shortage area [2] to which the applicant has been assigned or in a unit of the Department of Health and Human Services to which an applicant may be assigned, if the Secretary determines that there is no need in a shortage area for a Corps member of the profession of the applicant. [3] The applicant is required to

---

**1.** The National Health Service Corps was established in 1970 as part of the Public Health Service under the auspices of the Department of Health and Human Services, 42 U.S.C. § 254d, and consists of three categories of members: (1) commissioned officers of the Regular and Reserve Corps of the Public Health Service (PHS Commissioned Corps); (2) civilian employees of the United States; and (3) other individuals who are not employees of the United States. 42 U.S.C. § 254d(a)(1). The National Health Scholarship Program was established by Congress to "assure an adequate supply of trained physicians, dentists and nurses for the National Health Service Corps." 42 U.S.C. §§ 254*l*, m.

**2.** The Secretary is required by statute to identify those geographic areas, population groups or medical facilities which have a shortage of health manpower. Such designation of health manpower shortage areas is revised on an annual basis. *See* 42 C.F.R. § 5.3. In making such a determination, the Secretary takes into consideration various indicators of need and the ratio of health manpower and the percentage of physicians serving an area, population group or facility. 42 U.S.C. § 254e(b), (c). Upon an area or facility being designated a shortage area, it is the duty of the NHSC to assign physicians, dentists and other health professional to such area to rectify the maldistribution of health services.

**3.** A recipient of a scholarship may be released from his or her service obligation under 254m(a) if the individual agrees to engage in a full-time private clinical practice of his or her health profession in a health manpower shortage area for a period of time equal to the period of his or her service obligation. 42 U.S.C. § 254m. Similarly, a recipient may meet his

perform one year of obligated service for each school year for which the applicant was provided a scholarship, for a minimum of two years. 42 U.S.C. § 254*l* (f)(1)(B)(iv).

In applying for such a scholarship, the Secretary is required to provide each applicant with a "fair summary of the rights and liabilities of an individual whose application is approved and whose contract is accepted, including in the summary a clear explanation of the damages to which the United States is entitled under Section 254o ... in the case of the individual's breach of contract[.]" 42 U.S.C. § 254*l* (c)(1); *see* Declaration of Dr. Edward D. Martin, paragraph 3 (hereinafter referred to as "Declaration").

The recipient's period of obligated service is to commence upon completion of his or her medical training unless a deferment is granted to allow the recipient to complete advanced clinical training, an internship or residency. 42 U.S.C. § 254m(b)(5)(A); 42 C.F.R. § 62.9. Pursuant to the terms of the statute, a recipient with a degree in osteopathy is not, however, entitled to a deferment of his or her service obligation for more than three years unless the Secretary determines that the deferment for such advanced training is consistent with the needs of the NHSC.[4] Such information on deferments is conveyed to each applicant in the Applicant Information Bulletin which is provided to each applicant as part of the application process prior to execution of a scholarship contract. Declaration ¶ 3. This is the same bulletin which explains the rights and liabilities of an applicant under the scholarship contract.

Damages for breach of a scholarship contract are also clearly outlined in the written contract submitted to each applicant as required by statute. 42 U.S.C. §§ 254*l* (c)(1), § 254o (b)(1). If a recipient of scholarship

funds fails to begin his or her service obligation in accordance with the provisions of either Section 254m or 254n, the damages which the government are entitled to receive are determined by the algebraic formula $A = 30$, the theta being the sum of the amounts paid to the recipient and the interest thereon at the maximum legal prevailing rate as determined by the Treasurer of the United States. Under such algebraic formula, the total sum which the United States would be entitled to recover would be an amount equal to three times the scholarship funds plus interest.

Scholarships are not automatically awarded to every individual who submits an application. In 1978 when Dr. Swanson first applied for the scholarship, there were 5,364 applicants. Dr. Swanson was one of the 3,346 applicants whose application was accepted. Declaration, ¶ 5. Priority in awarding scholarships is given to those applicants in medical or osteopathic programs who indicate their intention to enter family practice, internal medicine, pediatrics, or osteopathic general practice residencies or other types of clinical practice in health manpower shortage areas, 42 C.F.R. §§ 62.6(c)(1), (2). Legislative history makes it clear that the NHSC Scholarship Program was not created solely to subsidize the medical education of future health care practitioners:

> The Committee wishes to emphasize in the strongest possible terms that it does not view the National Health Service Corps scholarship program as a mechanism solely intended to subsidize health professional education. Rather, in return for substantial subsidization of the costs of education, the committee views the National Health Service Corps Scholarship program as a means to overcome a geographic maldistribution of health professionals.

---

service obligation by serving under a National Research Award. 42 U.S.C. § 254m(e).

**4.** As the government noted, at the time Defendant applied for a NHSC Scholarship in May of 1978, the NHSC Scholarship Program had no statutory authority to grant deferments which

exceeded three years. In 1979, this provision was amended by Pub.L. 96–76, to give the Secretary discretionary authority to approve deferments in excess of three years if such deferments were consistent with the needs of the NHSC.

Senate Report 94–887, 94th Cong. 1st Sess. p. 201 (1975).

In the matter presently before the Court, the undisputed facts concerning the scholarship contract in question are as follows: In May of 1978, while a student at the College of Osteopathic Medicine and Surgery in Des Moines, Iowa, Defendant Michael J. Swanson, D.O., applied for a scholarship award through the National Health Service Corps Program. As part of the application process, Defendant was provided with a copy of the Applicant Information Bulletin wherein the rights and liabilities of an individual whose application is accepted by the government and the damages to which the government would be entitled to receive for breach of the contract were clearly explained. Declaration, ¶ 3. In addition, such bulletin also informed the Defendant that applicants indicating an interest in primary health care or who have no plans for postgraduate training would be given priority in the awarding of any scholarships. Declaration, ¶ 3. The Bulletin likewise informed the Defendant that graduates in osteopathic medicine would not be granted a deferment for completion of residency training for a period in excess of three years.[5] Finally, the Bulletin informed Defendant that scholarship participants were required to fulfill their service obligation in designated manpower shortage areas as either an officer of the Commissioned Corps in the Public Health Service or as a Federal employee of NHSC.

In his application for such scholarship funds, Dr. Swanson responded to questions concerning his career goals and directions in a manner which directly corresponded with the stated priorities of the Secretary to award scholarships to those individuals interested in pursuing primary care medicine in medically underserved areas. In response to the following questions in the application, Defendant stated as follows:

A. After fulfilling your scholarship commitment period, do you intend to continue practicing your profession in a medically underserved area?

Dr. Swanson: Probably yes. At present, I would like to live and practice medicine in the rural intermountain West; that is, in the area between Canada and Mexico bordered by the Rocky Mountains on the East and the Sierra-Cascade crest on the West. This area is largely rural and medically underserved, and will likely remain so in the foreseeable future. However, my primary interest lies in medicine as a vocation and as a service to the human community, and I would like to practice in an area where this interest would be served regardless of geographical, economical, or political circumstances. It is very probable that I will practice in a medically underserved area for the rest of my life.

B. Would you prefer a research orientation in your practice?

Dr. Swanson: No. I am not research oriented, and it is unlikely that I would have a research-oriented practice. I do not think that I would consider a research-oriented practice unless it could be integrated into a general or family practice without diminishing the quality of the latter.

C. Do you intend to obtain an additional educational degree as part of the current training for which you are seeking scholarship?

Dr. Swanson: No. I cannot in any way foresee the pursuit of any addi-

---

5. The yearly extensions of the written contract for the scholarship funds signed by the Defendant specifically provides that the Defendant agrees to comply with the obligations imposed by the Scholarship Program Contract and Section 751 of the Public Health Service Act 42 U.S.C. § 254*l*, and with the obligations imposed by the regulations implementing the scholarship program in 42 C.F.R. Part 62. The regulations specifically provide that the Secretary will defer beginning obligated service to allow a participant to complete an approved graduate training program. The period of this deferment may not exceed 3 years for a graduate in osteopathy. The regulations also provide that "[t]he Secretary may, however, extend this period of deferment if the Secretary determines that the extension is consistent with the needs of the National Health Service Corps." 42 C.F.R. § 62.9(a).

tional educational degree. Further, I have neither the need nor the desire to do so. The D.O. degree will allow me to practice primary care medicine, and that is sufficient for my vocational interests.

E. In your future professional practice, do you see yourself primarily as a first contact health care provider?

Dr. Swanson: Yes.

As a result, Defendant's application for scholarship funds under the National Health Corps Scholarship Program was given special consideration pursuant to the selection criteria outlined in 42 C.F.R. § 72.6(c). Declaration, ¶ 4.

On September 1, 1978, the contract signed by the Defendant and submitted with his application for scholarship funds, was accepted by the Secretary. Pursuant to such contract, Defendant received, in total, some $14,232.00 for tuition, fees and a stipend for the period of July 1, 1978, to June 30, 1979. Declaration, ¶ 5. On May 25, 1979, Defendant was awarded a continuing scholarship award for the period beginning July 1, 1979, and ending June 30, 1980, in the amount of $14,437.00. Declaration, ¶ 6. Such scholarship for the second year of medical training was awarded pursuant to an extension and amendment of the original scholarship contract signed by the Defendant on March 21, 1979. Declaration, Exhibit D. Finally, on May 29, 1980 Defendant was awarded an additional continuing scholarship award for the period of July 1, 1980, and ending June 30, 1981, in the amount of $15,829.00, pursuant to an extension and amendment agreement signed by the Defendant on February 12, 1980. For three years of medical training, Defendant received some $44,498.00 in scholarship funds and consequently incurred a three year service obligation upon completion of his medical education in July of 1981. Declaration ¶ 8; 42 U.S.C. § 254m(b)(5)(A); 42 C.F.R. § 62.9.

Prior to Defendant's graduation in July of 1981, Defendant applied for and was granted a one-year deferment of his service obligation to complete an internship at an osteopathic hospital in Farmington Hills, Michigan. Declaration, ¶ 10. Sometime prior to completion of Defendant's internship, the NHSC sent Defendant placement materials and a site selection questionnaire (SSQ) in anticipation of Defendant commencing his service obligation in July of 1982. When Defendant returned his SSQ in August 1981, he indicated an interest in pursuing further medical training prior to starting his service obligation. Declaration, ¶ 11. Dr. Swanson was informed that he was required to submit a formal request for additional deferment to the Secretary, and that if such a deferment was not approved, he would be required to contact the NHSC to begin the matching process for his July 1982 placement. Declaration, ¶ 11. Defendant submitted a formal request for an additional deferment to the Chief of the Deferment Branch of the NHSC Scholarship Program by letter dated September 26, 1981. Declaration, ¶ 11. Defendant's request for an additional four year deferment to complete surgical training was denied by letter from the Chief of the Deferment Branch in October of 1981. Declaration, ¶ 12. The letter of denial merely reiterated the terms of Defendant's initial written contract with the government and the subsequent extensions regarding deferments for residency training. As the letter of denial explained, requests to complete residence programs which exceed three years cannot be approved under Section 338 B of the PHSA unless the specialty was "specifically designated and approved by the Secretary as needed by the NHSC to fulfill its mission in health manpower shortage areas." Declaration, Exhibit J. Defendant was informed by the Secretary that surgery neither met the time-limitation for deferments or a designated need. Declaration, ¶ 12.

Upon denial of Defendant's request for an additional deferment, Defendant was required to begin his service obligation upon the expiration of his approved deferment on June 30, 1982. Declaration, ¶ 13. When Defendant did not begin his service obligation as scheduled in July of 1982, and instead elected to pursue a nondeferable

surgical residency, he was placed in breach of his scholarship contract, effective November 29, 1982, and informed that the United States was entitled to recover an amount equal to three times the scholarship funds paid to Defendant, plus interest. Declaration, ¶ 13; 42 U.S.C. §§ 254m, *o* (b)(1).

This action was subsequently commenced by the federal government in this Court to recover damages pursuant to 42 U.S.C. § 254*o* (b)(1) for breach of contract under the National Health Scholarship Corps program, and is presently before the Court on Defendant's motion for summary judgment.

## II. SUMMARY JUDGMENT PRINCIPLES

Before addressing the claims of the parties, it is incumbent upon this Court to review the principles of law governing a motion for summary judgment. Rule 56(c) provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Sixth Circuit recently reiterated the principles governing consideration of a motion for summary judgment in *Watkins v. Northwestern Ohio Tractor Pullers Ass'n.*, 630 F.2d 1155 (6th Cir.1980);

> The District Court may grant a motion for summary judgment only if it finds from the whole record before it that there are no material facts which are in dispute. It may not make findings of disputed facts on a motion for summary judgment. The movant has the burden of showing conclusively that there exists no genuine issues as to a material fact and that the evidence together with all inferences to be drawn therefrom must be considered in the light most favorable to the party opposing the motion. The movant's papers are to be closely scruti-

nized while those of the opponent are to be viewed indulgently.

*Id.* at 1158; *see also Ghandi v. Police Department of the City of Detroit,* 747 F.2d 338 (6th Cir.1984).

The party moving for summary judgment "bears the burden of clearly establishing the non-existence of any genuine issue of fact material to a judgment in his favor." *United States v. Article of Device ...,* 527 F.2d 1008, 1011 (6th Cir.1975); *see also United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1970); *Smith v. Hudson,* 600 F.2d 60 (6th Cir. 1979). If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that he is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1967), *reh. denied,* 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *see also Daily Press, Inc. v. UPI,* 412 F.2d 126 (6th Cir.1969), *cert. denied,* 396 U.S. 990, 90 S.Ct. 480, 24 L.Ed.2d 453 (1969); *Bufalino v. Michigan Bell Telephone Co.,* 404 F.2d 1023 (6th Cir.1968); *Doff v. Brunswick Corp.,* 372 F.2d 801 (9th Cir.1967). Rule 56(e) makes clear that parties are not entitled "to get to the jury on the basis of allegations in their complaints, coupled with the hope that something can be developed at trial ..." *First National Bank of Arizona v. Cities Services Co.,* 391 U.S. at 289–90, 88 S.Ct. at 1592–93. The opponent must at least produce "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 289, 88 S.Ct. at 1592; *see also Ghandi v. Police Department of the City of Detroit,* 747 F.2d 338 (6th Cir.1984).

The Court will now address the arguments of the parties.

## III. BREACH OF CONTRACT

This Court begins by noting that in the absence of a contrary statute, the general

principles governing the rights and duties and construction of a contract apply to contracts entered into by the United States. As the Supreme Court stated in *Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935):

> When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments.

294 U.S. at 352; *see also United States v. Essley*, 284 F.2d 518, 520 (10th Cir.1960); *United States v. Standard Rice Co.*, 323 U.S. 106, 65 S.Ct. 145, 89 L.Ed. 104 (1944); *Gilbert v. United States*, 1 Ct.Cl. 28, 37 (1863), *Aff'd*, 8 Wall. 358, 75 U.S. 358, 19 L.Ed. 303 (1869).

■ As a general rule, the validity, interpretation and construction of contracts with the federal government, including the rights and obligations of the parties thereto, is governed by principles of general Federal contract law. *See Priebe & Sons v. United States*, 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947). This is particularly true where, as in the instant case, overriding Federal interest in promoting the express Congressional purpose underlying the NHSC scholarship program dictates that the remedy for enforcement of such a contract should not depend upon the peculiarities or variances found in State laws. *See United States v. Riley*, 340 F.Supp. 1164 (D.C.W.D.La.1972); *United States v. Hext*, 444 F.2d 804 (5th Cir.1971).

In the instant case, it seems clear to this Court that a valid and binding contract was created between the parties to this action on September 1, 1978, when the Secretary approved the Defendant's application for a scholarship under the NHSC scholarship program and signed the contract previously submitted and signed by the Defendant as part of the application process. This contract was renewed by subsequent agreements signed by the parties in May of 1979 and again in 1980. Certainly, it goes with-

out saying that this original contract and each of the subsequent agreements is supported by adequate consideration.[6]

The terms and conditions set forth in the contract are clear and unambiguous. The contracts clearly and succinctly set out the rights and obligations of both the United States and the Defendant under the scholarship contract and the statutory authority governing such contractual arrangement. The contracts signed by the Defendant and accepted by the government likewise clearly provide that deferments may not be granted for advanced clinical training or residencies in excess of three years. The extension contracts in 1979 and 1980 provide by way of amended regulations that deferments beyond three years are only permissible "if the Secretary determines that the extension is consistent with the needs of the National Health Scholarship Corps." 42 C.F.R. § 62.9. Clearly, the determination of deferments beyond the three year period is within the sole discretion of the Secretary. Moreover, the contract clearly outlines the Defendant's duty under the contract to perform obligated service upon completion of his medical training in an area designated by the Secretary as a health manpower shortage area. Finally, it is undisputed that Defendant failed to commence his three year period of obligated service according to the terms of the contract.

This Court rejects Defendant's suggestion that it is bureaucratic meglomania and the refusal of the government to "negotiate" the terms of his service to the NHSC that forced Defendant into default. Defendant entered into the contractual agreement with open eyes. He was not forced to apply for or accept the scholarship money offered by the government. However, once having done so, the government and the people it serves, have a right to the Defendant's service. Indeed, the Defendant has a duty to meet his obligation by serving in the PHSC in an area and manner

---

**6.** This Court agrees with the Plaintiff's position that Defendant's defense in which he raises the claim that there was no consideration to sup-

port these contracts is totally without merit and should be stricken.

in which the Secretary determines Defendant's services are most needed. Defendant points to no evidence in the contract, or otherwise, that would lead anyone to believe that the service obligation of a physician is a negotiable item.

Thus, it seems clear to this Court that Defendant stands in breach of contract under his NHSC contract unless there is a genuine issue of material fact as to any of the defenses raised by the Defendant.

## IV. ESTOPPEL AND ORAL MODIFICATION

Defendant's first affirmative defense is estoppel. Defendant's estoppel argument is premised entirely on Defendant's assertion that certain unnamed and unknown individuals, including a chief of surgery from several Public Health Service Hospitals, were acting as agents of the Secretary and represented to the Defendant in July of 1979 that deferments for a residency in surgery were available and that these residencies were acceptable to the NHSC. (Affidavit, Swanson.) Defendant asserts that he relied upon such representations in planning his career in surgery and such representations "instilled in Defendant the expectancy that he could serve as a surgeon." Defendant contends that the government should now be estopped from denying such representations.

■ Aside from the question of whether such unnamed individuals are agents of the Secretary, estoppel is rarely, if ever, a valid defense against the government absent proof of some affirmative misconduct by a government agent. *See Heckler v. Community Health Services of Crawford Co.,* 467 U.S. 51, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984) (hereinafter referred to as *Heckler*); *United States v. River Coal Company, Inc.,* 748 F.2d 1103, 1108 (6th Cir.1984); *Schweiker v. Hansen,* 450 U.S.

785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981).

In order to prevail on the estoppel argument, the Defendant would be required to demonstrate at trial that at least the traditional elements of estoppel are present. *Heckler*, 104 S.Ct. at 2224. The Supreme Court outlined the elements of traditional estoppel in the recent case of *Heckler v. Community Health Services of Crawford Co., supra,* as follows:

> If one person makes a definite misrepresentation of fact to another person having reason to believe that the other person will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled
>
> .     .     .     .     .
>
> (b) to regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired.

104 S.Ct. at 2223 (quoting Restatement (Second) of Torts § 894(1) (1977). The Court in *Heckler* went on to explain that "the party claiming the estoppel must have relied on its adversary's conduct 'in such a manner as to change his position for the worse,' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." 104 S.Ct. at 2223.

■ In the instant case, this Court is convinced that the alleged representations by government agents as to the availability of deferments for surgical residencies is not the type of "affirmative misconduct" on the part of the government which would give rise to estoppel against the government.[7] Moreover, there is no evidence that Defendant relied upon such representations

---

**7.** The Supreme Court in *Heckler* also made it clear that estoppel against the government cannot be premised on oral representations:

> The necessity for ensuring that governmental agents stay within the lawful scope of their authority, and that those who seek public

funds act with scrupulous exactitude, argues strongly for the conclusion that an estoppel cannot be erected on the basis of the oral advise that which underlay respondent's cost reports.

104 S.Ct. at 2227.

to his detriment or changed his position for the worse. Defendant does not allege that such representations were an inducement for entering into the original contract in 1978. Indeed, such alleged representations were not made until some four months after Defendant renewed his contract with the government in March of 1979. Defendant points to no evidence to raise any issue as to his reliance. In fact, Defendant's affidavit merely indicates that such alleged representations were made but does not aver that he relied upon them in any manner. Aside from the allegations in Defendant's pleadings that he relied upon such representations in planning his career in surgery, there is no evidence before the Court to raise any issue for trial as to Defendant's reliance. Moreover, even if Defendant did rely upon these statements by planning a career in surgery, this is not the type of detrimental reliance required by the rule. The mere "expectancy" that he would be permitted to have a deferment for a surgical residence and some unspecified "arranging for such a career" are not the types of acts necessary to prove a change for the worse under the estoppel doctrine. At the most, Defendant's career in surgery would have merely delayed until after he performed his period of obligated service with the government. Defendant was not permanently deprived of the opportunity to pursue a surgical residency as the result of any alleged misrepresentations.[8]

Finally, any argument Defendant might advance as to his detrimental reliance on such representations is completely contradicted by his admission in his letter to the Chief of the Deferment Branch on September 26, 1981, that he "fully realize[s] that this [a deferment for the purpose of completing a residency in surgery] is not acceptable to the P.H.S.C. . . . ." Declaration, Tab I. *See Heckler,* 104 S.Ct. at 2223 n. 10.

For these reasons, Defendant defense of estoppel must fail.

In a related argument first raised at oral arguments on this motion, Defendant asserts that summary judgment is inappropriate because there is a material question of fact as to whether the contract between the parties was orally modified by representations of unknown individuals that Defendant could obtain a deferment for a surgical residency. Aside from the fact that this argument was not raised as a defense in Defendant's answer or otherwise, Plaintiff has never admitted the agency status of these unknown persons.

■ The Court has no quarrel with the proposition that a written contract may be orally modified. However, Defendant premises his entire argument of oral modification upon the assumption that these unknown individuals were acting as agents of the government with the requisite authority to bind the government to an oral modification of the scholarship contract. Assuming arguendo that such representations concerning deferments were in fact made by these unknown individuals, this fact alone is not sufficient to bind the government to an alleged modification of the contract absent a finding that these individuals were acting in the capacity of agents for the Secretary.

Aside from Defendant's bald conclusional statement in his pleadings that these individuals were agents of the government, there is no evidence before the Court to raise a genuine issue for trial as the agency status of these individuals. Moreover,

---

**8.** The Court also notes that it Defendant's claim of reliance in this case would not have been reasonable under the circumstances. The contracts and regulations governing deferments clearly provide that no deferments in excess of three years are possible unless the Secretary determines there is a need for the specialization. There is nothing in the contract or regulations which would lead a reasonable person to believe that any other person would have the authority to grant Defendant a deferment, especially the head of surgery at a Public Health Service Hospital. Defendant was fully aware of the procedure for obtaining a deferment as he had already applied for a deferment for one year from the Secretary through the proper channels.

Defendant's separate argument that this contract must fail due to misrepresentation also must fall for the same reasons cited by this Court in rejecting Defendant's estoppel argument.

given that these individuals are both un-named and unknown, Defendant would be unable to bring forth any evidence at trial to prove that these individuals were agents of the government and that these statements were made within the scope of their authority. Since the Court would be required to direct a verdict in favor of Plaintiff on this issue at the close of all the proofs, summary judgment on the defense of oral modification is appropriate. *See Bill Johnson's Restaurants, Inc. v. N.L. R.B.*, 461 U.S. 731, 103 S.Ct. 2161, 2171 n. 11 (1983); *Wilcox v. Transamerican Freight Lines, Inc.*, 371 F.2d 403 (6th Cir.), *cert. denied*, 387 U.S. 931, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967).

## V. LIQUIDATED DAMAGE PROVISION UNENFORCEABLE AND OPERATES AS A CRIMINAL PENALTY

Defendant next contends that summary judgment is inappropriate for the reason that the provision in the scholarship contract providing for multiple damages is unenforceable because it operates as a penalty. Defendant also asserts that such a damage provision is so onerous as to constitute a criminal penalty, thereby requiring the Court to provide Defendant with the full due process protections accorded to a defendant in a criminal trial.

■ The Court finds this position absurd. As the Defendant correctly notes, the Courts have long upheld statutory imposition of multiple damages as a civil penalty and the imposition of punitive damages. For instance, it is well established that a private right of action for treble damages under the antitrust laws, 15 U.S.C. § 15, is not by its nature a criminal penalty to which all the constitutional safeguards of a criminal proceeding attach. *See Herald Company v. Harper*, 410 F.2d 125 (8th Cir.1969) (even if treble damages provision was punitive in nature, that is not enough to label it a criminal statute); *see also United States v. Hess*, 317 U.S. 537, 548–52, 63 S.Ct. 379, 386–88, 87 L.Ed. 443 (1942) (mere fact that more than precise amount of actual damages recovered or that "punishment" may result from imposition of multiple damages is not sufficient to label it as a criminal statute).

■ In the instant case, neither the statutory provision which governs the amount of damages nor the legislative history reveal that Congress intended the statute to operate as a penalizing mechanism. *See* 42 U.S.C. § 254o (b)(1). The mere fact that the provision on damages for breach of the scholarship contract may result in "punishment" for failure to complete the service obligation does not make the statute criminal. *Hess*, 317 U.S. at 551, 63 S.Ct. at 387. Review of the legislative history of the statute reveals that the major purpose of the NHSC program is to remedy the shortage of medical care providers in manpower shortage areas. Certainly, imposition of multiple damages upon a doctor for his failure to meet his service obligation in these critical areas is an equitable remedy and entirely compensatory in its effect. Who is to measure the reasonable value of a doctor's services for three years in an underserved area? Certainly it is far greater than the precise amount of the money expended by the federal government in financing the doctor's education. To suggest otherwise would be totally illogical.

For these reasons, the Court rejects Defendant's argument that the statutory damages provision for breach of the NHSC contract is criminal in nature within the meaning of *United States v. Ward*, 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980).

Defendant also claims that the liquidated damage provision in the scholarship contract is void because it operates as a penalty. Defendant contends that the principle of compensation has been totally disregarded and that the damages provision was strictly to deter physicians from breaching their contracts.

A liquidated damage provision is "a sum fixed as an estimate made by the parties at the time when the contract is entered into,

of the extent of injury which a breach will cause." Williston, *Contracts* § 776; *see also Pacific Hardware & Steel Co. v. United States,* 48 Ct.Cl. 399, 406 (1913). At common law, contractual provisions calling for damages without regard to the extent or character of a subsequent breach were regarded as penalties and consequently unenforceable. *Van Buren v. Digges,* 11 How. (52 U.S.) 460, 461, 476, 13 L.Ed. 771 (1850); *Sun Printing & Publishing Assoc. v. Moore,* 183 U.S. 642, 22 S.Ct. 240, 46 L.Ed. 366 (1902). The modern trend is to permit the parties to a contract to determine damages in the event of breach without judicial interference unless such a provision is unreasonable or unconscionable. *United States v. Bethlehem Steel Co.,* 205 U.S. 105, 27 S.Ct. 450, 51 L.Ed. 731 (1907); *Jennie-O Foods, Inc. v. United States,* 217 Ct.Cl. 314, 580 F.2d 400, 412 (1978).

■ Whether a liquidated damage provision is in fact unconscionable or an unenforceable penalty provision is a matter of law to be determined by the Court in light of all the circumstances. *See In re United Merchants & Mfrs., Inc.,* 674 F.2d 134, 141 (2d Cir.1982) (New York law); *In re Construction Diversification, Inc.,* 36 B.R. 434, 436 (1983) (applying Michigan law).

The general rule for determining if a liquidated damages provision is valid and enforceable was aptly stated by the United States Supreme Court in *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947):

> * * * When they [liquidated damages provisions] are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. * * * They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. * * * And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract.

332 U.S. at 411–12, 68 S.Ct. at 125–26; *see also Higgs v. United States,* 546 F.2d 373, 377, 212 Ct.Cl. 146 (1976); *Steffen v. United States,* 213 F.2d 266, 270 (6th Cir.1954); *United States v. Bethlehem Steel Co.,* 205 U.S. at 120–21, 27 S.Ct. at 455–56.

In the instant case, the damages for breach of the scholarship contract under the NHSC scholarship program are clearly outlined by statute. Where a scholarship recipient fails to complete his medical training, the amount of the damages required to be repaid to the government is simply the amounts which have been paid to such person under the scholarship program. 42 U.S.C. § 254*o* (a). However, where a recipient completes his or her medical training and fails to commence his or her service obligation under the contract, the damages are set according to an algebraic formula at approximately three times the principal plus the interest. 42 U.S.C. § 254*o* (b)(1). Defendant, Dr. Swanson, failed to commence his obligated service as required under the contract, the government having paid on Defendant's behalf some $44,-498.00. The government indicates that the interest on such principal balance as of June 30, 1984, is $29,544.19. When such interest and principal are added together and multiplied times three, the damages under the liquidated damage provision of the contract would be $222,126.57 as of June 30, 1984.

The Defendant contends that such an amount completely disregards the principle of compensation and operates strictly as a penalty upon physicians who fail to meet their obligation by serving in the NHSC.

■ The Court finds that the damage provision in the scholarship contract which provides for triple payback in addition to interest does not operate as an unenforceable penalty. As the Defendant accurately noted in his pleadings, a physician or health care professional is not a "fungible handyman." To estimate the damages which would be suffered by the loss of the services of a trained osteopathic physician for a three year period in a medically underserved area is difficult, if not impossible, to

accurately determine. The Court cannot say that damages which the government would be entitled to receive for Defendant's breach of the contract bears no relation to the actual damages suffered by the government, or that they were not a fair and reasonable attempt to fix just compensation in the event of breach.

Contrary to Defendant's contention, the actual damages in this case are not limited solely to the monies given by the government to finance the Defendant's education. The fact that the government may also have intended that the damage provision deter physicians from reneging on their service obligation and would ensure that the public would obtain the services of trained health care professionals in areas of need is of little moment given the Court's determination that the damages were impossible of accurate estimation and are a reasonable pre-estimate of the probable loss.

For the above reasons, this Court holds that the liquidated damage provision does not operate as a penalty and is valid and enforceable in a court of law. In addition, to the extent the Defendant raises the argument that the damage provision and the contract in question are unconscionable, this Court rejects this assertion in light of the previous conclusion.

## VI. DUE PROCESS CLAIM

Defendant next contends that summary judgment is inappropriate because of his defense that he has a due process right to a hearing prior to the government depriving the Defendant of government benefits to which he claims he is contractually entitled, namely the right to participate in the NHSC program and government employment.

█ The Court finds this position totally meritless. This is a matter of breach of contract. Defendant points to no authority which requires the government to provide Defendant with a due process hearing prior to holding him in default for breach of contract and commencing this lawsuit. While the Defendant might have been ac-

corded some "property" interest and concommitant right to a hearing if he had performed according to the terms of the contract and was terminated from his employment during the course of his service, his "right" to a government benefit was nothing more than an expectancy at the time of his breach. The law is clear that such an expectancy does not create a property interest within the meaning of the due process clause. *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

█ The Court rejects Defendant's claim as wholly without merit that the regulations governing partial or total waiver of a service obligation or payment under the NHSC program are arbitrary and capricious. *See* 42 C.F.R. § 62.12. The regulations provide that the Secretary may waive or suspend a service obligation or payment where a participant suffers from a physical or mental disability and his service is rendered impossible. The Secretary may also waive or suspend service or payment under the regulations as imposing undue hardship and being against equity and good conscience. The Secretary may take into consideration the participant's financial resources and obligations and the extent to which the participant has problems of a personal nature which would intrude upon the participant's present and future ability to perform. 42 C.F.R. § 62.12(2)(d). The circumstances under which waivers and suspensions of obligations may be granted has been committed to the discretion of the Secretary. The Court will not intrude absent a showing of bad faith or that the regulations are repugnant to statutory authority. *See Board of Trade of City of Chicago v. Commodity Futures Trading Commission,* 605 F.2d 1016, 1021–22 (7th Cir.1979), *cert. denied,* 446 U.S. 928, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980). Defendant has made no such showing in the matter presently before the Court. For this reason, the Court declines to review the action of the agency.

## VII. CONCLUSION

In summary, the Court holds that Defendant has breached his contract with the government in failing to perform his period of obligated service and that the government's motion for summary judgment will be granted. The government shall submit an appropriate order reflecting the opinion of this Court.