**UNITED STATES of America, Plaintiff,**

v.

**Robert L. WALKER, Jr., Defendant.**

**Civ. A. No. 2:86–0579.**

United States District Court, S.D. West Virginia, Charleston Division.

Feb. 12, 1987.

R. Lynette Ranson, Asst. U.S. Atty., Charleston, W.V., for plaintiff.

Stephen R. Crislip and William J. Powell, Jackson, Kelly, Holt & O'Farrell, Charleston, W.V., for defendant.

## MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

This is an action brought by the United States to collect payments made to Dr. Robert Walker under the National Health Service Corps Scholarship Program. The United States moved for summary judgment with several supporting exhibits. The Defendant doctor opposed the motion and likewise attached exhibits. The Court earlier informed the parties, after consideration of the motion, that judgment would be entered in favor of the United States. This opinion explains the Court's reasoning.

### I. Background

The National Health Service Corps Scholarship Program (the Scholarship Program) "was established by Congress as a part of a comprehensive legislative effort to rectify the shortage of health resources in the area of primary health care services for urban and rural medically underserved populations in the United States." *United States v. Swanson*, 618 F.Supp. 1231, 1233–34 (E.D.Mich.1985). The Scholarship Program is based on a simple premise: the Secretary of Health and Human Services enters into a written contract with a medical student whereby the Secretary, acting through the Public Health Service (PHS), agrees to pay the expenses of the student's medical education, along with a monthly stipend, and in return the student agrees to be placed for two years or longer in a medically under-served area upon graduation from medical school.

The Defendant enrolled in the Scholarship Program in 1975. Although he graduated from medical school in 1977, he has not fulfilled any portion of his service obligation. Rather, the Defendant has elected to repay the money expended by the Government on his behalf. The parties agree that the principal owed by the Defendant is $28,504.00. They differ, however, as to the applicable rate of interest which applies to the principal amount. The PHS argues that a 15% rate applies; however, the Defendant argues that 8% is the correct rate. The difference in the interest rate substantially affects the total amount of the Defendant's indebtedness. Using the 8% figure, the Defendant admits to owing $49,824.07 as of July 21, 1985. The PHS argues, on the other hand, that the Defendant's indebtedness as of that date was $68,479.12. Hence, this case is limited to whether an 8% or 15% interest rate should be applied.

Using the Defendant's application for enrollment in the Scholarship Program as a starting point, the Court believes it would promote clarity to list the operative facts in a chronological order. For the most part these facts are not in dispute.

1. March 12, 1974. The Defendant applies for enrollment in the Scholarship Program.

2. March 21, 1975. The Defendant is notified by the PHS that he has been selected as a recipient of a PHS scholarship.

3. April 18, 1975. A scholarship is awarded to the Defendant for the period from July 1, 1974, to June 30, 1975.

4. May 15, 1975. The Defendant signs a continuation of scholarship award

for the period from July 1, 1975, to June 30, 1976.

5. April 20, 1976. The Defendant signs a continuation of scholarship award for the period from July 1, 1976, to June 30, 1977.

6. September, 1976. The Defendant requests deferment of his service obligation for a period of four years to complete obstetrics and gynelocology training.

7. June, 1977. The Defendant graduates from medical school.

8. June 10, 1977. The PHS grants the Defendant a deferment delaying the start of his service obligation until July 1, 1981.

9. August, 1978. The Defendant changes his major course of study from OB–GYN to anesthesiology.

10. November 20, 1979. The maximum legal rate of interest permissible in the District of Columbia increases from 8% to 15% per year.[1]

11. March 31, 1980. The Defendant informs PHS of the change in his course of study. Also, the Defendant advises the PHS that he will be available for placement in December, 1980.

12. June 10, 1980. The Defendant is informed that the Indian Health Service is the only program which has positions available for anesthesiologists.

13. July 1, 1981. The Defendant is technically scheduled to begin his service obligation on this date.

14. July 21, 1982. The Defendant breaches his agreement.

15. August 18, 1982. Anna Voight of the PHS writes to the Defendant informing him that he is in breach of his agreement with the PHS as of July 21, 1982.

She advises him that he must repay all sums within three years and that the applicable rate of interest is 8%.

16. August 31, 1982. The Defendant has a conversation with an official of the PHS. They go over the events leading up to the breach. The Defendant indicates that he will repay his monetary obligation.

17. December 6, 1982. The PHS by letter again notifies the Defendant that he is in default status and that an 8% interest rate applies during the three-year repayment period.

18. May 18, 1984. The Defendant receives a form letter (as do others) from Joseph M. Brown, Director of the Office of Financing Services, informing scholarship recipients that the legal permissible rate had increased from 8% to 15%. The letter also informs the recipients that a thirty-day grace period is in effect during which the recipients may pay their indebtedness at an 8% interest rate.

19. August 22, 1984. The Defendant converses with Joseph Brown. Brown purportedly asks the Defendant if he would be willing to sign a forebearance agreement in an attempt to again be placed by the PHS. The Defendant alleges that Brown assured him that if the proposed placement was not suitable, the placement could be refused and he could pay at 8%.

20. August 29, 1984. Brown sends a letter to the Defendant referencing their conversation on the 22nd. Brown mentions that an 8% rate applies, but he does not state that suitability of placement is a factor, or that after signing the forebearance agreement the Defendant will have the option of paying his indebtedness at an 8% rate.

---

1. The contract between the Defendant and the PHS was tied to the District of Columbia's Code allowable rate of interest.

 "If, for any reason, a participant fails to complete an active duty service obligation, such participant shall be liable for the payment of an amount equal to the scholarship payments, tuition and other educational fees paid, plus interest at the maximum legal prevailing rate running from the date such payments were made. Any amount which the United States is entitled to recover under this paragraph, shall within the three year period beginning on the date on which it is determined that a breach occurred, be paid the United States. For the purpose of this paragraph, maximum legal prevailing rate of interest shall mean the maximum permissible rate applicable to this type of debt prescribed by the District of Columbia Code on the day of breach.

21. November 19, 1984. A forebearance agreement is sent to the Defendant. The agreement says nothing of a modification.

22. November 27, 1984. The Defendant executes the forebearance agreement and returns it to the PHS, indicating acceptance of its terms.

23. January 24, 1985. The PHS approves the forebearance agreement and the same is executed by the agency.

24. March 20, 1985. The Defendant writes to the PHS and indicates that he will not accept any employment outside of West Virginia.

25. May 8, 1985. The PHS informs the Defendant that because of an identified need, he has been assigned to a site in Mississippi.

26. May 23, 1985. After traveling to Mississippi, the Defendant writes the PHS informing the agency that he will not accept placement at the proposed site in Mississippi.

27. June 6, 1985. A debt calculation was prepared for the Defendant using an 8% interest figure.

28. June 13, 1985. The Defendant is again informed that he has until July 21, 1985, to pay his indebtness. The figure quoted to him incorporates a 15% interest rate.

29. July 10, 1985. A calculation of the Defendant's debt is sent to him. It is based on a 15% interest rate.

30. July 18, 1985. The Defendant forwards a check to the PHS in the amount of $49,824.07, which included interest at 8%. Accompanying the check was a cover letter which stated that payment was enclosed "as full satisfaction of any and all sums owed to the PHS."

31. July 31, 1985. A PHS official informs the Defendant that his check is for an incorrect amount and that the agency will not accept the check with the restrictive endorsement.

32. October 31, 1985. The Defendant's check is returned to him by the PHS.

## II. *Discussion*

It is initially important to note what is not in dispute in this case. The Defendant admits all of the facts which prove the United States' prima facie case. He admits that he entered into an agreement with the PHS, that he did not abide by the terms of that agreement and that he is in default on that agreement. He admits that the amount of the principal is $28,504.00. The Defendant would also presumably admit that his agreement tied the interest rate to the maximum permissible rate under the D.C.Code, that said rate was increased to 15% in 1979, and that he breached the agreement in 1982. Having admitted all of the above, the Defendant argues that an 8% interest rate should be applied to his indebtedness. He asserts three equitable defenses as to why the United States is not entitled to an interest calculation at 15%.

### A. *Estoppel.*

The Defendant argues that the United States is estopped from applying the 15% interest rate. Estoppel, however, is a doctrine which has seldom been used against the Government. *Scheiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981) (per curiam); *INS v. Hibi,* 459 U.S. 14, 103 S.Ct. 281, 74 L.Ed.2d 12 (1982) (per curiam); *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). The black letter rule has been that the Government is not estopped by the misrepresentations of its agents. *Id.* Although the Supreme Court has refused to characterize the above rule as absolute, it has explicitly stated that there must be affirmative misconduct by the Government agent for the doctrine to apply. *Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984); *United States v. Swanson,* 618 F.Supp. 1231 (E.D.Mich.1985).

In addition to proof of affirmative misconduct, the Government's adversary must establish the traditional elements of equitable estoppel. The Supreme Court has phrased those elements in the following terms.

"If one person makes a definite misrepresentation of fact to another person having reason to believe that the other will rely upon it and the other in reasonable reliance upon it does an act ... the first person is not entitled

\* \* \* \* \* \*

(b) To regain property or its value that the other acquired by the act, if the other in reliance upon the misrepresentation and before discovery of the truth has so changed his position that it would be unjust to deprive him of that which he thus acquired."

*Heckler,* 467 U.S. at 59, 104 S.Ct. at 2223 (quoting *Restatement (Second) of Torts,* § 894(1) (1979)).

It is first clear that the Defendant does not argue that he detrimentally relied upon the representations of Government officials in breaching his service contract. There is no evidence that any representations were made to the Defendant before the breach as to what interest rate would apply. He is not told that it will be 8% or 15% or whatever. He knows only that the rate is tied to the D.C.Code. It is safe to assume, therefore, that *if* the Defendant did an economic analysis of his decision to breach the service agreement, he at that time factored in the legal interest rate. He may not have in fact known that it was 15%, but he is *presumed* to have knowledge of that fact, such being a codified law reasonably accessible to the Defendant. *Heckler v. Community Health Services, supra; Emery Min. Corp. v. Secretary of Labor,* 744 F.2d 1411 (10th Cir.1984).

It is only after the breach that the Defendant picks up the equitable estoppel argument. He argues that he would have paid the debt sooner had he known that a 15% rate was applicable.

The Defendant points to the August 18, 1982, letter from PHS as the first communication to him that the interest rate was 8%. The Defendant then proceeds through the chronology of facts to isolate, including the August 18, 1982, communication, five particular instances when the Government informed him that the interest rate was 8%. The Defendant by this accumulation of evidence attempts to raise a genuine issue as to affirmative misconduct on the part of the Government. The Defendant's methodology, however, is flawed. The Defendant cannot point to several instances as eventually adding up to estoppel and then reach back and declare that the Government is estopped *ab initio.* It is true that in a situation such as this one, there could come a time when the Government is estopped, but that estoppel would be effective from that point forward in time only. The earlier incidents favoring estoppel may influence the ultimate finding of estoppel, but they are not themselves determinative of the question absent independent foundation.

The August 18, 1982, letter, standing alone, does not establish affirmative misconduct on the part of the Government. It is at most negligence. It is a misstatement of the law which the Defendant is presumed to know—the law which the Defendant contracted to be governed by. The December 6, 1982, letter is of a similar nature. It was a document routinely generated by the PHS which negligently misstated the applicable interest rate.[2]

Nothing more is heard from the Defendant or the Government until May 18, 1984. On that date, the Government sends a form letter to scholarship recipients informing them that they were incorrectly advised of the applicable interest rate. Instead of 8% it is 15%. It is at this point that the Defendant can no longer plead ignorance of the law. He knows that the maximum permissible interest rate in the District of Columbia is 15%. He knows that he executed an agreement which provided that the rate of interest applicable to any repayment will be that provided by the D.C.Code at the time of the breach. He further knows that he breached the contract in

---

**2.** It can also be said that the debt calculation done for the Defendant in June of 1985 was an act of negligence.

1982 and that the D.C.Code rate was adjusted upward in 1979.

The Defendant pleads that he was yet told that the applicable interest rate was 8%. He argues for estoppel. At this point, however, estoppel, even its traditional form, is unavailable to the Defendant. For the Defendant to avail himself of the doctrine of estoppel, he must be ignorant of the truth concerning the material facts. The Defendant is not ignorant at this point, if indeed he can be said to have ever been ignorant. He absolutely knows that a 15% interest rate applies to his debt.[3]

Any pleas made by the Defendant subsequent to the May 18, 1984, letter that the Government is estopped on the applicable interest rate actually go to the issue of modification. Modification is another of the Defendant's defenses.

### B. *Modification.*

■ The Court, of course, is cognizant of the familiar principal that a written contract may be orally modified. The Defendant, however, cannot raise a genuine issue of fact as to modification on the undisputed facts of this case.

First, any argument by the Defendant that the representations made by the PHS officials in 1982 amounted to a modification of the applicable interest rate must fail. Such so-called modifications were not supported by consideration. They were merely the product of negligence on the part of the Government officials. The Defendant cannot accomplish by guise of modification what the doctrine of estoppel cannot do for him.

Second, the Court likewise perceives a consideration problem with the modification which allegedly grew out of the August, 1984, conversation and correspondence between the Defendant and Joseph Brown. The evidence favorable to the Government shows that it at most agreed to another short grace period in August or September of 1984, because the Defendant, probably due to his own fault,[4] did not timely receive the May 18, 1984, letter. The Court, on this summary judgment motion, however, must construe the evidence in the light most favorable to the Defendant. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). The Defendant argues that arising out of his conversation with Brown was an agreement to apply an 8% interest rate to the outstanding debt if the Defendant would sign a forebearance agreement promising to *consider* placement. If he was not satisfied with the placement assigned to him, the Defendant contends, he could elect not to fulfill the service obligation and pay the principal with 8% interest.

Even assuming that Brown had the authority to modify the agreement of the parties, there is no consideration to support such a modification, if it indeed occurred. There is no benefit or detriment moving between the parties. In essence, the Defendant's version of the modification produces nothing more than an agreement to think about agreeing. It is well established that contracts to contract in the future are not enforceable. *See, e.g., Ridgeway Coal Co., Inc. v. FMC Corp.,* 616 F.Supp. 404 (S.D.W.Va.1985).

---

**3.** In a footnote to its *Heckler* decision, the Supreme Court spoke to the requirement for ignorance on the part of the party seeking to utilize the principles of estoppel.

"The truth concerning these material facts must be unknown to the other party claiming the benefit of the estoppel, not only of the time of the conduct which amounts to a representation or concealment, but also at the time when that conduct is acted upon by him. If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negli-

gence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment."

*Heckler, supra,* 467 U.S. at 59–60, n. 11, 140 S.Ct. at 2224, n. 11 (quoting 3 J. Pomeroy, *Equity Jurisprudence,* § 810, at 219).

**4.** The initial letter to the Defendant in regard to his default status directed him to notify the agency of any change in address. August 18, 1982, letter of Anna Voight. Apparently the Defendant did not do so. The May 18, 1984, letter was delayed in reaching him.

Finally, there is an even more fundamental reason why the Defendant's modification argument must fail. As mentioned, the above sketched scenario is provided by the Defendant. He relates his version in an affidavit attached to his opposition to the motion for summary judgment. That version is nowhere else supported in the evidence of record. Indeed, the document growing out of those discussions in August, 1984, the forebearance agreement executed by the parties in November, 1984, and January, 1985, is a fully integrated document which purports to be the agreement of the parties. Its relevant portions are set forth in the margin.[5] The document in no way incorporates the oral modifications which the Defendant claims were made. Thus, in addition to the problem of consideration, the Defendant runs afoul of the parol evidence rule.

## C. *Unconscionability.*

 Finally, the Defendant argues that the provision of his agreement relating to interest is unconscionable and, therefore, void. The question of unconscionability is a matter of law to be determined by the Court in light of all the circumstances. *United States v. Swanson, supra,* at 1243. The *Swanson* case involved facts similar to those here. In *Swanson,* however, the Defendant doctor was subject to treble damages rather than mere repayment plus interest. The doctor argued that the imposition of multiple damages was unconscionable. The court rejected the doctor's argument, finding that the value of the doctor's services in an underserved area was difficult to measure.

Certainly the interest provision which the Defendant here agreed to is far less Draconian than the treble damages at play in *Swanson.* It must also be kept in mind that the interest rate employed in the contract was left to the wisdom of a deliberative body. It was not selected willy-nilly by the Government. The reasoned action of a legislative body must be deemed to cloak the interest rate with legitimacy. Moreover, the Court cannot say that a 15% interest rate is unconscionable when such a rate has been and continues to be used in all manner of commercial transactions.

The Defendant admits that he read the agreement containing the interest clause. He argues, however, "that even upon reading the contract, a true understanding could not have taken place given the terms of the contract and the lack of explanation from the Government officials." Defendant's memorandum at 20. The Court rejects the Defendant's contention. The agreement is neither ambiguous nor overly complex. It is patently incredible for the Defendant, an intelligent, mature man, to contend that the provision was not understandable. The Defendant may not like the consequences of his agreement, but unpalatability does not make a contract unconscionable.

## III. *Conclusion*

The Court has considered the three equitable arguments raised by the Defendant and finds them to be without merit. Finding no genuine issue of material fact to exist, the Court concludes that the Plain-

---

5. "This document establishes the terms and conditions under which the Bureau of Health Care Delivery and Assistance (hereinafter referred to as the Bureau) will exercise forebearance with respect to collection of the financial obligation incurred by the undersigned scholarship recipient under a public health and national health service corps scholarship program contract.

\* \* \* \* \* \*

The Bureau agrees to suspend activities related to the collection of the debt incurred by the scholarship recipient for as long as the scholarship recipient remains in compliance with the terms and conditions of this forebearance agreement. Although no monetary repayment will be required from the scholarship recipient during this period of forebearance, interest will continue to accrue. Upon satisfactory completion of the service obligation, the scholarship recipient's entire debt will be discharged.

If the scholarship recipient should fail to begin or complete the NHSC service obligation described in this forebearance agreement, his/her financial obligation, in an amount determined in accordance with the scholarship agreements/contracts and applicable law, will become due and owing immediately or upon expiration of the statutory repayment period, whichever is later...."

tiff, the United States, is entitled to judgment as a matter of law.

The effect of this ruling is that a 15% interest rate will be applied to the Defendant's indebtedness from the date the payments were made. The Court does not have the figures before it to compute the total amount of that indebtedness. The principal, of course, is the undisputed amount of $28,504.00. There may be a dispute, however, as to when the interest on that amount stops. Accordingly, the parties are directed to confer within five days and, if possible, agree on a figure to be submitted to the Court. Absent agreement, the parties are directed to brief the issue. The Defendant shall state its position within ten days of the date this Order is entered. The Plaintiff shall reply seven days thereafter. Entry of final judgment shall be delayed awaiting report of the parties.