**UNITED STATES of America, Plaintiff,**

v.

**Shari Lin HAITHCO, a/k/a Shari L. Haithco-Clarke, R.N., Defendant.**

**No. G84–449 CA5.**

United States District Court, W.D. Michigan, S.D.

July 7, 1986.

John A. Smietanka, U.S. Atty., Edith A. Landman, Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff.

Dunnings & Canady, Stuart J. Dunnings, III, Lansing, Mich., for defendant.

## OPINION REGARDING CROSS–MOTIONS FOR SUMMARY JUDGMENT

HILLMAN, Chief Judge.

This matter is before the court on cross motions for summary judgment filed by plaintiff United States of America ("plaintiff") and defendant Shari Lin Haithco ("defendant"). For the reasons stated below, plaintiff's motion is granted and defendant's motion is denied.

*Procedural History*

This case was mandatorily submitted to arbitration on February 12, 1986, pursuant to W.D. Mich. R. 43, and judgment on the arbitrator's award was entered on February 19, 1986. Plaintiff demanded a trial de novo on February 27, 1986, and the judgment was accordingly vacated on February 28, 1986, pursuant to Rule 43(j)(1). The case was thereafter submitted to the court on briefs, stipulated exhibits and the oral testimony of defendant taken on April 1, 1986.

*Factual History*

On June 24, 1978, while a nursing student at Michigan State University School of

Nursing, defendant applied for a National Health Services Corps ("NHSC") scholarship. (Plaintiff's Exhibit 4). The NHSC scholarship program, 42 U.S.C. § 254*l*, *et seq.*, was established by Congress to address health resource shortages among rural and urban medically underserved populations. The program, administered by the Secretary of Health and Human Services ("HHS"), provides scholarships to eligible students in specified professional health degree programs.[1] In exchange for the scholarship funds, the students agree by written contract (the terms of which are statutorily established) to serve a "period of obligated service" with the NHSC commencing when the applicant's training is completed.

On September 30, 1978, defendant was awarded a NHSC baccalaureate nursing scholarship for the period beginning July 1, 1978 and ending June 30, 1979, in the sum of $7,432.00. On May 25, 1979, defendant was awarded a continuing scholarship for the period beginning July 1, 1979 and ending June 30, 1980, in the sum of $7,610.40. (*See* Plaintiff's Exhibit 1).

The NHSC scholarship program contract (Plaintiff Exhibit 5) signed by defendant obligated her to a two-year service obligation as a NHSC member in health manpower shortage areas designated by the NHSC.[2] Defendant was provided with a NHSC scholarship program bulletin (Plaintiff Exhibit 6), explaining program procedures,[3] and clearly reiterating the service obligation.[4] The bulletin also explained that Baccalaureate nursing scholarship participants such as defendant would be assigned for their service obligation to the Indian Health Service ("IHS") for further placement to IHS patient-care facilities for American Indians or Alaskan Natives.[5]

Breach of the scholarship contract by failure to begin or complete the service obligation triggers statutorily prescribed penalties expressly set forth in both the contract and the bulletin.[6] By statute, and contract, damages recoverable by the United States for such a breach amount to three times the scholarship funds paid to

---

1. The scholarship program was created to "assure an adequate supply of trained physicians, dentists and nurses" for the NHSC. 42 U.S.C. §§ 254*l*, 254m. The Corps itself is part of the Public Health Service ("PHS") and is comprised of three types of members: (1) commissioned officers of the PHS Regular Corps and Reserve Corps; (2) civilian employees of the federal government; and (3) others not employees of the United States. 42 U.S.C. § 254d(a)(1).

2. 42 U.S.C. § 254e. Section B of the contract (Plaintiff Exhibit 5) details the obligations of the applicant and states, in pertinent part, that:

    "[t]he applicant agrees to:

    *   *   *   *   *

    4. [s]erve in the full-time clinical practice of . . . her profession (a) as a commissioned officer in the Regular or Reserve Corps of the Public Health Service or as a civilian member of the Corps in a health manpower shortage area designated under Section 332 of the Public Health Service Act to which the applicant is assigned."

3. Plaintiff Exhibit 6, Bulletin, p. 13. Participants were notified 60 days prior to graduation of the terms of their service obligation. They then were to submit applications for appointment to the Commissioned Corps or Civil Service not later than 30 days before graduation. They were thereafter designated NHSC members and their obligated service began on the date of their NHSC appointment.

    Placement locations for the obligated service are limited to designated health manpower shortage areas with the greatest need at the time of assignment and placement commitments thus cannot be made until some six months prior to a participant's availability for service. At that point, participants are asked for their location preferences. The NHSC makes the final placement decision and attempts to meet participant preferences when possible.

    Baccalaureate nursing scholarship participants, however, are automatically and exclusively assigned to the Indian Health Service ("IHS") for further placement to IHS patient-care facilities for American Indians or Alaskan Natives.

4. The NHSC Scholarship Program bulletin, Plaintiff Exhibit 6, states, at p. 13:

    "Scholarship program participants are obligated for 1 year of full-time clinical practice of their professions in designated health manpower shortage areas for each year of scholarship support they receive, with a minimum service period of 2 years."

5. Plaintiff Exhibit 6, Bulletin, p. 13.

6. *See,* 42 U.S.C. § 254*o* (b)(1); Plaintiff Exhibit 5, Contract, Section C, ¶ 3; Plaintiff Exhibit 6, Bulletin, p. 14.

the recipient plus interest, calculated by a statutory algebraic formula.[7] The contract also provided for waiver or suspension of an applicant's service or payment obligations under certain circumstances, and the bulletin further explained the waiver or suspension procedures.[8]

Prior to her graduation, defendant attended an IHS site placement conference in October, 1979, where she orally requested placement at Red Lake Hospital, an IHS facility, in Bemidji, Minnesota. On November 1, 1979, IHS tentatively assigned defendant to the Bemidji program office (Plaintiff Exhibit 8). Defendant was notified of this assignment by letter of November 19, 1979 from Sylvia Rhodes, R.N., Acting Chief, Nursing Services Branch of the IHS. (Plaintiff Exhibit 9). Ms. Rhodes reminded defendant that her personnel application for NHSC membership had to be submitted in January of 1980.

On February 22, 1980, defendant wrote to the director of nursing in Bemidji asking for information about the area (Plaintiff Exhibit 11). Her letter crossed in the mail with a February 22, 1980 letter (Plaintiff Exhibit 17, attachment) from Susan Vieira, Chief, Nursing Services Branch, Bemidji program office, confirming defendant's tentative assignment to the Bemidji area for placement after graduation, but advising that Red Lake would not have a vacancy by July, 1980, although a vacancy would exist in September, 1980, when a new IHS Red Lake Hospital facility was to open. Defendant was asked to convey her interest in this latter position to IHS. On March 3, 1980 (Plaintiff Exhibit 17, attachment), Ms. Vieira forwarded personnel applications to defendant and provided her

---

7. 42 U.S.C. § 254*o* (b)(1) provides:

§ 254*o*. Breach of scholarship contract

(b) Failure to commence or complete service obligations; formula to determine liability; payment to United States

(1) Except as provided in paragraph (2), if an individual breaches his written contract by failing (for any reason not specified in subsection (a) of this section or section 254p(d) of this title) either to begin such individual's service obligation in accordance with section 254m or 254n of this title or to complete such service obligation, the United States shall be entitled to recover from the individual an amount determined in accordance with the formula

$$A=3\emptyset \left( \frac{t\text{-}s}{t} \right)$$

in which "A" is the amount the United States is entitled to recover, "0" is the sum of the amounts paid under this subpart to or on behalf of the individual and the interest on such amounts which would be payable if at the time the amounts were paid they were loans bearing interest at the maximum legal prevailing rate, as determined by the Treasurer of the United States; "t" is the total number of months in the individual's period of obligated service, and "s" is the number of months of such period served by him in accordance with section 254m of this title or a written agreement under section 254n of this title. Any amount of damages which the United States is entitled to recover under this subsection shall, within the one year period beginning on the date of the breach of the written contract (or such longer period beginning on such date as specified by the Secretary for good cause shown), be paid to the United States.

8. Plaintiff Exhibit 5, Contract, Section E(2) provides:

"The Secretary may waive or suspend the applicant's service or payment obligation incurred under this contract if: (a) compliance by the applicant with the terms and conditions of this contract is impossible or would involve extreme hardship, and (b) enforcement of such obligation would be unconscionable."

Plaintiff Exhibit 6, Bulletin, provides, in pertinent part, at p. 15:

"Participants may submit written requests to the Scholarship Program for waiver or suspension of part or all of their service or financial obligation. These requests must state the underlying circumstances and be supported by documentation for consideration by the Secretary of HEW.

A waiver of suspension may be granted in cases where fulfillment of the service or financial obligation would be impossible or would involve extreme hardship, and if enforcement would be unconscionable ...

In determining whether to waive or suspend a participant's obligation, the Secretary will take into consideration such factors as present financial resources and obligations, estimated future financial resources and obligations, and problems of a personal nature (e.g. physical or mental disability, terminal illness in the immediate family) which intrude on the participant's ability to serve or repay."

with further information on the Bemidji area and facilities.

Instead of replying to IHS, defendant wrote to Ms. Rhodes on March 11, 1980 (Plaintiff Exhibit 12), regarding the lack of vacancies at Red Lake Hospital in Bemidji and inquired as to possible placement in "other health manpower shortage areas which utilize PHS personnel for staffing purposes." Defendant suggested several facilities in Michigan, none of them IHS sites. On March 31, 1980, by telephone, Ms. Rhodes advised defendant that as a Baccalaureate nursing scholarship recipient, she had to remain within the IHS for her service obligation assignment. Ms. Rhodes further explained that defendant was not qualified for the positions in Michigan for which IHS assigned Commissioned Corps officers, nor did the clinics listed by defendant hire NHSC baccalaureate nurses, choosing instead to hire local, experienced nurses. (Plaintiff Exhibit 18). Defendant thereafter orally agreed that she would wait for the position at Red Lake Hospital in September, 1980. (Plaintiff Exhibit 12a)

On May 9, 1980, defendant wrote PHS Regional Health Administrator E. Frank Ellis, M.D. (Plaintiff Exhibit 13), regarding the history of her entry into the scholarship program, her attempts at renegotiating her service obligation, and the frustrations and anxieties the program created for her. She requested that her service and payment obligations be cancelled due to personal hardship. Dr. Willis responded on May 22, 1980 (Plaintiff Exhibit 14), that defendant would have to contact the NHSC scholarship program Service Obligation Section ("SOS") to discuss information required for a waiver request to be considered.

During the week of June 2, 1980, Ms. Rhodes reached defendant by telephone to discuss her placement but the line was disconnected and repeated calls to defendant's number produced only busy signals. A June 5, 1980 memo from Ms. Rhodes to Ms. Anna May Voigt of the NHSC scholarship program SOS reported that repeated requests for submission of defendant's employment application since October 1979 had gone unanswered and defendant's failure to submit the requisite application was hindering her placement and delaying the start of her pay-back obligated service. (Plaintiff Exhibit 14a).

By letter of June 16, 1980 (Plaintiff Exhibit 15), Dr. Donald Swetter, Medical Director and Director, PHS Division of Resource Coordination, reminded defendant that a placement location had been designated for her within the IHS, that her personnel application was overdue, and that she would be deemed in default of her contract obligations if her application was not received within two weeks. She responded by letter of June 20, 1980 (Plaintiff Exhibit 16) that her hesitation to submit an application stemmed from her efforts to obtain a waiver of her service obligation. On June 22, 1980, defendant wrote Ms. Voigt at the SOS (Plaintiff Exhibit 19) reiterating her request for a waiver of her repayment and service obligations, citing a variety of personal problems.[9]

A July 9, 1980 memo from Ms. Vieira to Ms. Rhodes (Plaintiff Exhibit 17) summarized Ms. Vieira's contacts with defendant, reflecting that she had called defendant several times with no answer or return and on one occasion, on June 5, 1980, spoke with her briefly, finding her aloof and not freely communicative regarding her plans to come to Red Lake. During that conversation, Ms. Vieira advised her that a June vacancy would, in fact, be available at Red

---

**9.** In her May 9, 1980 letter (Plaintiff Exhibit 13), defendant cited her grandmother's recent death from cancer, her mother's glaucoma and history of hypertension, her elder brother's adjustment difficulties and defendant's own role as facilitator of communication between her divorced parents and her two brothers. She also cited guaranteed student loans, a car note and various other outstanding bills which allegedly rendered her financially unable to repay her scholarship. In her June 22, 1980 letter (Plaintiff Exhibit 19) she added that she had recently become engaged to a Lansing attorney and "do not feel I should pressure him into moving to an Indian Reservation since he is in the midst of establishing a practice in this area."

Lake and assured defendant that she would have a position there. Defendant failed to respond to two later calls from Ms. Vieira regarding the placement.

On July 9, 1980, Ms. Rhodes wrote to Mr. Gary Wold of the NHSC scholarship program (Plaintiff Exhibit 18), summarizing defendant's history with the program, her resistance to complying with the pay-back obligation requirements, and Ms. Rhodes concluded that waiver of that obligation for defendant was not recommended. On August 13, 1980, defendant was advised (Plaintiff Exhibit 20) by a program specialist with the scholarship program that additional information was required before her request for waiver could be considered, including reports from the treating physician of defendant's mother and brother. A statement regarding her mother's health was apparently forwarded sometime later by defendant; since her brother had not sought medical attention, no documentation was submitted regarding him.

On March 2, 1981 (Plaintiff Exhibit 20a), Ms. Rhodes recommended to Mr. Wold that defendant be placed in default. On April 8, 1981, (Plaintiff Exhibit 21), Ms. Voigt of SOS wrote defendant advising that she was considered in breach of the conditions of her award and subject to liability, per the statutory algebraic formula, of $45,127.20 (triple the $15,042.40 in scholarship funds paid to her) plus interest. She was advised that she could make a lump sum or monthly installment payments. She was also told that any request for waiver or suspension of her obligation would have to be submitted with the requisite documentation to the SOS. Defendant failed to make any payments and submitted no further waiver documentation.

On December 30, 1982 (Plaintiff Exhibit 22), defendant was advised that her debt then totalled $66,791.90 (principal amount of $45,127.20 plus accrued interest of $21,-664.70 calculated through January 1983), and was told that her failure to remit payment in full by January 31, 1983 would result in referral of her delinquent account for collection action. Defendant made no payment on her account. Collection efforts between March and September 1983 proved futile. (Plaintiff Exhibit 23). Defendant wrote to Congressman Dennis Hartel in September 1983 (Plaintiff Exhibit 24) complaining about harassment by the collection agency and her financial inability to pay. She stated in that letter that "when I was first contacted by them, I have advised that I was awaiting word from the Health Service Corps regarding my negotiating a new site for repayment of my debt and also cancellation of debt owed if a new site would not be agreed upon." This purported understanding on defendant's part is nowhere confirmed or reflected in IHS or NHSC scholarship program records.

In response to an October 25, 1983 inquiry from Congressman Hertel (Plaintiff Exhibit 25), Dr. Edward Martin, Assistance Surgeon General and Director of the PHS, wrote detailing defendant's case history. Dr. Martin stated that if defendant signed a conditional service agreement committing her to accept an assignment in her profession at an IHS practice site determined by the NHSC, the PHS would consider permitting her to fulfill her service obligation as an alternative to pursuing collection efforts. Dr. Martin suspended financial collection activities on her account until January 31, 1984, pending her decision. Defendant never responded to this offer.

On April 10, 1984 (Plaintiff Exhibit 3), Joseph Brown, Director of the PHS Office of Financing Services, certified that defendant's liability, through April 30, 1984, amounted to $75,941.34 ($45,127.20 principal and interest of $30,814.14). This lawsuit was filed on April 27, 1984.

The United States' motion for summary judgment claims that no genuine issue of material fact remains as to defendant's breach of contract, and that it is therefore entitled to judgment, as a matter of law, in the amount of $45,127.20 principal, plus $39,023.79 interest as of August 5, 1985, plus interest accruing at the rate of $15.53 per day, pursuant to the statute and defendant's contract. Plaintiff claims the

statutory and contractual liquidated damages provision is valid and enforceable.

Defendant's response to the government motion was a cross motion for summary judgment on grounds that the liquidated damages provision constitutes an unenforceable penalty. Alternatively, defendant claims that even if enforceable, the service or payment obligation should be totally or partially waived since compliance with it would be impossible or would involve extreme hardship to her.

*Standard of Review*

On a motion for summary judgment, movant bears the burden of showing conclusively that no genuine issue of material fact exists. *Smith v. Hudson,* 600 F.2d 60 (6th Cir.), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979); *Tee-Pak, Inc. v. St. Regis Paper Co.,* 491 F.2d 1193 (6th Cir.1974); Fed.R.Civ.P. 56(a). In determining whether issues of fact exist, "the inferences to be drawn from the underlying facts contained in [the affidavits and attached exhibits] must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). A court may not resolve disputed questions of fact in a summary judgment decision, and if a disputed question of fact remains, the district court should deny the motion, and proceed to trial. *United States v. Articles of Device,* 527 F.2d 1008, 1011 (6th Cir.1976).

*Discussion*

Defendant's breach of the NHSC contract is not and cannot be disputed. She admitted that the NHSC contract she signed obligated her to a two year pay-back service obligation. She also acknowledged that she was aware of the treble damage provision at the time she signed the contract. Although defendant graduated from Michigan State's nursing school in June 1980, she has not fulfilled her service obligation nor has she submitted the requisite materials for her request for waiver of that obligation to be considered. The only issue remaining is whether the statutory and contractual treble damage provision is valid

and enforceable against Ms. Haithco. I find that it is.

The validity and enforceability of the liquidated damage provision set forth in 42 U.S.C. § 254*o* (b)(1) and the NHSC scholarship contracts was recently litigated in *United States v. Swanson,* 618 F.Supp. 1231 (E.D.Mich.1985). After a complete and cogent review and analysis of the statute's legislative history and the underlying purpose of the NHSC scholarship program, Judge Freeman noted, in pertinent part:

"The general rule for determining if a liquidated damages provision is valid and enforceable was aptly stated by the United States Supreme Court in *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 68 S.Ct. 123, 92 L.Ed. 32 (1947):

* * * When they [liquidated damages provisions] are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced. * * * They serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts. * * * And the fact that the damages suffered are shown to be less than the damages contracted for is not fatal. These provisions are to be judged as of the time of making the contract. [Citations omitted]

In the instant case, the damages for breach of the scholarship contract under the NHSC scholarship program are clearly outlined by statute.... [W]here a recipient completes his or her medical training and fails to commence his or her service obligation under the contract, the damages are set according to an algebraic formula at approximately three times the principal plus the interest. 42 U.S.C. § 254*o*(b)(1). Defendant, Dr. Swanson, failed to commence his obligated service as required under the contract, the government having paid on Defendant's behalf some $44,498.00. The government indicates that the interest on such principal balance as of June 30, 1984, is $29,544.19. When such interest and prin-

cipal are added together and multiplied three times, the damages under the liquidated damage provision of the contract would be $222,126.57 as of June 30, 1984.

\* \* \* \* \* \*

"The Court finds that the damage provision in the scholarship contract which provides for triple payback in addition to interest does not operate as an unenforceable penalty. As the Defendant accurately noted in his pleadings, a physician or health care professional is not a 'fungible handyman.' To estimate the damages which would be suffered by the loss of the services of a trained osteopathic physician for a three year period in a medically underserved area is difficult, if not impossible, to accurately determine. The Court cannot say that damages which the government would be entitled to receive for Defendant's breach of contract bears no relation to the actual damages suffered by the government, or that they were not a fair and reasonable attempt to fix just compensation in the event of breach.

Contrary to Defendant's contention, the actual damages in this case are not limited solely to the monies given by the government to finance the Defendant's education. The fact that the government may also have intended that the damage provision deter physicians from reneging on their service obligation and would ensure that the public would obtain the services of trained health care professionals in areas of need is of little moment given the Court's determination that the damages were impossible of accurate estimation and are a reasonable pre-estimate of the probable loss.

For the above reasons, this Court holds that the liquidated damage provision does not operate as a penalty and is valid and enforceable in a court of law. In addition, to the extent the Defendant raises the argument that the damages provision and the contract in question are unconscionable, this Court rejects this assertion in light of the previous conclusion." *Id.*, 618 F.Supp. at 1243–1244.

I find Judge Freeman's analysis thorough, well reasoned and compelling, and fully concur in the conclusion reached by him and find it applicable to the case at bar. Accordingly, I hold that the liquidated damage provision set forth in the statute and in defendant's contract is valid and legally enforceable against her.

Moreover, I do not find enforcement of that penalty against her to be unreasonable or unconscionable. She voluntarily and knowingly made a commitment in exchange for the funds she needed to complete her nursing education. She reneged on that commitment. She sought a waiver of the resulting service obligation, which she had a right to do, but never followed through on sending the requisite information necessary for that waiver to be processed. While I am not unsympathetic with Ms. Haithco's personal problems and with her frustration in dealing with the PHS, she opted to accept government funds to complete her education and did so knowing full well that the quid pro quo for those funds was a two year service obligation through the IHS in a medically underserved area. That she might have found a service placement in Michigan more convenient in terms of her family, her marriage or her desire to pursue a graduate nursing degree is irrelevant. The NHSC scholarship program is ultimately designed to serve needs larger than the personal needs of the scholarship recipient. The record in this case reveals that the IHS and PHS went to some lengths to assure Ms. Haithco the Red Lake Service Unit placement she had requested, and to accommodate her request for waiver consideration. Ms. Haithco was several times advised of the documentation necessary for her waiver request to be considered and told where to direct such a request. Ms. Haithco repeatedly failed to submit the necessary documentation. The NHSC even agreed, as late as January 1984, to suspend financial collection activities and give Ms. Haithco a chance to fulfill her service obligation. Ms. Haithco failed to respond to the offer. Ms. Haithco has been earning between $21,000 and $25,000 per year since 1983 and her individual

debts at present total less than $1,000.00. This is not a record which would justify total or partial waiver of defendant's service or payment obligation even if I had authority to grant such a waiver, an issue the parties have not addressed.

CONCLUSION

For the reasons stated, defendant's motion for summary judgment is denied, plaintiff's motion for summary judgment is granted, and plaintiff shall recover from defendant the sum of $45,127.20 principal ($15,042.40 × 3), plus $39,023.79 interest as of August 5, 1985, for a total of $84,150.99, plus interest from August 5, 1985 at the rate prescribed by 42 U.S.C. § 254o (b)(1).