**In re Bruce L. DILLINGHAM, Debtor.**

**UNITED STATES of America, Plaintiff,**

v.

**Bruce L. DILLINGHAM, Defendant.**

**Bankruptcy No. A87–03992–JB.
Adv. No. 87–0417A.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

June 8, 1989.

James R. Schulz, Asst. U.S. Atty., Atlanta, Ga., for plaintiff.

Robert D. Schwartz, Clark, Smith, Thomson & Schwartz, Atlanta, Ga., for defendant.

## MEMORANDUM OF OPINION AND ORDER

JOYCE BIHARY, Bankruptcy Judge.

In this adversary proceeding, the United States seeks a judgment against the debtor, Dr. Bruce L. Dillingham, pursuant to two scholarship agreements, and it seeks a determination that the claims are nondischargeable in bankruptcy. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B) and (I). A trial was held on this matter and the Court gave counsel an opportunity to file post-trial briefs. After considering all of the testimony and the evidence presented, argument of counsel and the post-trial briefs, the Court makes the following findings of facts and conclusions of law.

The debtor, a medical doctor, received funds for his third and fourth years of medical school at the University of Miami School of Medicine under the Public Health and National Health Service Corps Scholarship Training Program and the National Health Service Corps Scholarship Program (the "Scholarship Programs"). The purpose of the Scholarship Programs was to supply physicians and other health care professionals to those areas of the United States where there was a shortage of health care professionals. In order to achieve this goal, the Government would pay for the scholar's educational expenses, and the scholar would agree to practice for a certain length of time in an area with a health manpower shortage.

In the 1977–78 academic year, the debtor was awarded tuition, fees and monthly cash payments in the amount of $11,850.00. The debtor agreed to the conditions of the scholarship in a document entitled Notice of Scholarship Award ("the 1977 Contract").[1] In the 1978–79 academic year, the debtor was awarded tuition, fees and monthly cash payments in the amount of $10,634.00. The debtor agreed to the conditions of this scholarship in a document entitled "National Health Service Scholarship Program Contract" ("the 1978 Contract").[2]

In both the 1977 Contract and the 1978 Contract, the debtor agreed to fulfill his service obligation after he became licensed as a medical doctor. The service obligation could be fulfilled by serving for two years as a commissioned officer in the Public Health Service or as a civilian member of the National Health Service Corps ("NHSC") in a federally designated critical health manpower shortage area, or by a private practice option, under which the debtor could, with government and community approval, set up a private practice in a federally designated health manpower shortage area. Both the 1977 Contract and the 1978 Contract contain provisions regarding the amounts due the Government should the debtor fail to begin or complete his obligated service.

The debtor graduated from medical school in 1979. After graduation, the Government granted the debtor a three year deferment of his service obligation to allow him to pursue a residency training in family practice. He began his residency in

---

1. The 1977 Contract was entered into pursuant to Section 225 of the Public Health Service Act, then codified at 42 U.S.C. § 234, and since repealed.

2. The 1978 Contract was entered into pursuant to Section 751 of the Public Health Service Act, then codified at 42 U.S.C. § 294t *et seq.*, now codified at 42 U.S.C. § 254*l et seq.*

family practice at a hospital affiliated with the University of Colorado School of Medicine in Pueblo, Colorado.

In the third and last year of the debtor's residency, the Government sent the debtor information on how to commence his service obligation. On February 1, 1982, the Government notified the debtor of a placement conference on February 12–14, 1982 where physicians could be matched with employers in health manpower shortage areas. The debtor did not attend this conference or make any request to attend any other placement conference.

In March of 1982, three months short of completing his residency, the debtor received notice that he was terminated from the Southern Colorado Family Medicine residency program. The debtor initiated formal grievance procedures protesting his termination.[3] The Government learned of the debtor's difficulties through a letter dated April 14, 1982, sent from the acting director of the residency program to Dr. Randall Lortscher at the Public Health Service. The letter advised the Government that the debtor had been terminated from the residency program and stated that the debtor could complete his residency training in family medicine with a remedial program to correct deficiencies. The letter further stated "[u]nder no circumstances can I recommend that Dr. Dillingham practice in a solo practice in a remote area without other physicians who are able to monitor his practice".

The debtor never commenced his service obligation. The debtor never served or applied to serve as a commissioned officer in the Public Health Service; the debtor never served or applied to serve as a civilian member of the NHSC in a federally designated critical health manpower shortage area; and the debtor never sought or obtained Government or community approval to set up a private practice in a federally designated health manpower shortage area.

The debtor argues that he made himself available for service, but that his performance of the service obligation was excused or refused by the Government. The only evidence offered by the debtor that he made himself available for service was the debtor's testimony about one telephone call between the debtor and Dr. Lortscher of the Public Health Service in April of 1982. The debtor testified that he asked Dr. Lortscher to assist him in placement, that Dr. Lortscher read aloud the April 14, 1982 letter he received from the acting director of the Colorado residency program, and that Dr. Lortscher said that he would put the matter on the back burner until after the grievance hearing.

The Government offered credible evidence that a placement can be made and approved only upon the written application of the scholarship recipient. There is nothing in the debtor's file to indicate that the debtor ever made any written application to commence his service obligation. There is nothing in the debtor's file to indicate that he ever made any written application for placement or for approval of any private practice option.

The Government treated the letter of April 14, 1982 as a request for an additional one year deferment of the debtor's service obligation. This was done for the debtor's benefit, to give the debtor time to work out his problems and to complete his residency. This additional one year deferment was in keeping with the Government's policy of giving medical doctors every opportunity to complete a residency program so that they could qualify for board certification.

After the deferment expired, the Government sent the debtor a number of letters regarding his failure to commence the service obligation and his resulting payment obligations, all of which the debtor ignored. On October 17, 1983, the Government wrote the debtor by certified mail advising him that he was in breach of his scholar-

---

**3.** The debtor's dispute with the Southern Colorado Family Medicine Residency Program over his termination is pending in the Colorado courts. Counsel in this bankruptcy proceeding advised the Court that the debtor is now appealing an adverse ruling from the Colorado trial court. The United States is not a party to that litigation.

ship awards as of August 26, 1983 for failure to begin the service obligation. The letter explained that the amounts due under the 1977 Contract would be due within three years (October 17, 1986) of the date of the letter and that the amount due under the 1978 Contract would be due within one year (October 17, 1984) from the date of the letter. The letter described various payment methods available and asked the debtor to reply in writing in thirty days as to the method elected to repay the debt. The debtor did not respond in any fashion to this letter.

On July 24, 1984, the Government wrote the debtor by certified mail reminding him that his debt was due on October 17, 1984. The letter advised the debtor that he could serve his obligation with the National Health Service Corps instead of making financial repayment and that if he wished to do so, he should complete and return an enclosed form within fifteen days. The debtor did not respond in any fashion to this letter.

On September 24, 1984, the Government sent the debtor another letter by certified mail advising him that the amounts due under the 1978 Contract would become due on October 17, 1984 and that the amount due under the 1977 Contract would become due on October 17, 1986. Again, the letter gave the debtor the opportunity to perform his service obligation instead of paying the amounts due by completing and returning an enclosed form in fifteen days. Again, the debtor failed to respond to this letter in any fashion.

On May 22, 1987, the debtor filed a petition under Chapter 11 of the Bankruptcy Code. Even after the petition was filed, the Government wrote the debtor on February 26, 1988 advising him of the enactment of a new law under which all scholarship recipients in default were to be given an opportunity to complete their obligations through a service program. The debtor was advised that if he wished to participate in the service program, he should respond by letter by May 29, 1988. The debtor did not respond in any way to this letter.

The debtor's argument that he was ready, willing and able to perform his service obligation is belied by the debtor's failure to attend any placement conferences, by his failure to submit any of the required written applications, and by his failure to respond to any of the correspondence from the Government. The one telephone conversation with Dr. Lortscher did not excuse the debtor from any financial or service responsibility under these scholarship contracts.

Furthermore, the Government did not refuse a tender of service or excuse the debtor's performance when it deferred the debtor's service obligation for a year in order to give him time to work out his problems. The one year extension was entirely reasonable given the April 14, 1982 letter indicating that the debtor could complete the residency with remedial help and given the Government's desire to give the debtor every chance to complete the residency when he had only three months remaining in the residency program.

The Government was not required to place the debtor in April of 1982 when he had failed to attend any placement conference, failed to file any written application for placement, failed to seek any approval of any private placement option and when the Government had a letter from the acting director of the debtor's residency program saying that he should not be allowed to practice alone in a remote area unsupervised. The Court finds that the Government acted reasonably in all respects and in fact treated the debtor exceedingly fairly by deferring the debtor's service obligation for a year.

Accordingly, the Court finds that the debtor failed to perform his service obligations under the two contracts and that his performance was neither excused nor refused by the Government. We now turn to the issues relating to the amount of damages under the two contracts and the Government's claim that the debts are nondischargeable.

### THE 1977 CONTRACT

The 1977 Contract provides for damages if the scholar does not fulfill the service

obligation. The provision tracks 42 U.S.C. § 234(f)(1) and applicable regulations and reads as follows:

[i]n accordance with Section 225(f) and the implementing regulations:

(a) If, for any reason a participant fails to complete an active duty service obligation, such participant shall be liable for the payment of an amount equal to the scholarship payments, tuition and other educational fees paid, plus interest at the maximum legal prevailing rate running from the date such payments were made. Any amount which the United States is entitled to recover under this paragraph, shall within the three year period beginning on the date on which it is determined that a breach occurred, be paid to the United States. For the purpose of this paragraph, maximum legal prevailing rate of interest shall mean the maximum permissible rate applicable to this type of debt prescribed by the District of Columbia Code on the day of breach.

The Government calculates damages under the 1977 Contract at $28,290.23 as of the date the petition was filed and at $31,-499.22 through March 9, 1989, with interest thereafter at $4.87 per day. The debtor has not disputed this amount in his post-trial brief, but disputes whether the debt pursuant to the 1977 Contract is nondischargeable.[4]

The parties agree that the dischargeability of the debt under the 1977 Contract is governed by 11 U.S.C. § 523(a)(8) which provides as follows:

(a) [a] discharge under section 727, 1141, 1228[a], 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt ...

(8) for an educational loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a govern-

mental unit or a nonprofit institution, unless—

(A) such loan first became due before five years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

This type of scholarship award has been determined to constitute an "educational loan" within the meaning of § 523(a)(8). *United States Department of Health & Human Services v. Brown (In re Brown),* 59 B.R. 40 (Bankr.W.D.La.1986); *United States Department of Health and Human Services v. Vretis (In re Vretis),* 56 B.R. 156 (Bankr.M.D.Fla.1985); *United States Department of Health and Human Services v. Avila (In re Avila),* 53 B.R. 933 (Bankr.W.D.N.Y.1985).

The debtor argues that the debt under the 1977 Contract first became due more than five years before he filed his petition in bankruptcy such that the debt is dischargeable under § 523(a)(8)(A). The debtor contends that the loan first became due on March 9, 1982, when he was terminated from his residency program. This date is more than five years prior to May 22, 1987, the date on which the debtor filed his Chapter 11 petition. The debtor cites no authority for his position and ignores the fact that the 1977 Contract allowed the debtor to repay the debt any time within three years following the breach.

The Government contends that the loan first became due three years after the date of breach and that the date of breach was August 26, 1983. Whether the debtor is considered to have breached his service obligation on March 9, 1982 or August 26, 1983 is irrelevant here if the Government

---

**4.** This calculation is based on an interest rate of 15%, which was the legal permissible rate of interest in the District of Columbia Code on August 26, 1983. At trial, debtor's counsel questioned the Government's use of a 15% interest rate, and debtor's counsel requested time to research and brief his position. However, debtor's post-trial brief contained no challenge to

the interest rate or to the Government's calculation of damages. Thus, the Court assumes that debtor has no dispute with the damages claimed under the 1977 Contract. In any event, the application of a 15% interest rate in a virtually identical situation was approved in *United States v. Walker,* 653 F.Supp. 818 (S.D.W.Va. 1987).

was first entitled to compel repayment of the debtor's obligation three years from the date on which the debtor breached his service obligation, since a date three years from either March, 1982 or August, 1983 is well within five years of the date the debtor filed his Chapter 11 petition.

The court in *United States v. Hogan*, 43 B.R. 117 (D.Ariz.1984) construed the language "first became due" in § 523(a)(8)(A) in a case involving a Public Health Service scholarship debt similar to the one in the case before this Court. The *Hogan* court held that "[a] loan becomes due when it is required to be paid, that is, when the first installment is due", *Id.* at 118, and that under 42 U.S.C. § 234(f)(1) (repealed) no installment was due or required to be paid until three years after the date of default.

■ This Court agrees with the reasoning in *Hogan* and holds that the debt under the 1977 Contract did not first become due until the end of the three year repayment period. The United States had no contractual or statutory authority to compel payment until the expiration of the three year period. While the debtor here could have elected an installment method of payment that may have altered the underlying agreement, the debtor never responded to the Government's October 17, 1983 letter and never elected a certain method of payment. In this case, no installments were due, and thus the loan first became due three years after the breach, which was well within five years of the date the debtor filed his Chapter 11 petition.

■ Finally, the debtor has failed to establish undue hardship under § 523(a)(8)(B) as a basis for dischargeability. He is currently practicing medicine with a freestanding clinic and is earning in the neighborhood of $80,000.00 per year. There was no evidence of poor health or physical impairment, and the debtor has the potential to satisfy this debt. Accordingly, the debt under the 1977 Contract is nondischargeable pursuant to 11 U.S.C. § 523(a)(8).

### THE 1978 CONTRACT

The issues relating to the Government's claim under the 1978 Contract are different

from those considered in connection with the 1977 Contract, because the scholarship award for the academic year 1978–79 was based on a different federal statute. Both the damages provision and the statute governing dischargeability are different from those applicable to the 1977 Contract.

The damages provision in the 1978 Contract provides for treble damages and tracks 42 U.S.C. § 254*o* (b)(1)(A). The 1978 Contract provides, in pertinent part, as follows:

Section C—Breach of Scholarship Contract

If the applicant: ...

3. Fails to begin or complete the period of obligated service incurred under this contract for any reason other than those in paragraph 2 of this section, the United States shall be entitled to recover an amount equal to three times the scholarship funds awarded, plus interest, as determined by the formula

$$A = 3\emptyset \frac{(t-s)}{t}$$

in which:

'A' is the amount the United States is entitled to recover,

'$\emptyset$' is the sum of the amounts paid to or on behalf of the applicant and the interest on such amounts which would be payable if at the time the amounts were paid they were loans bearing interest at the maximum legal prevailing rate, as determined by the Treasurer of the United States,

't' is the total number of months in the applicant's period of obligated service, and

's' is the number of months of such period served by the applicant in accordance with Section 752 of the Public Health Service Act.

The amount the United States is entitled to recover shall be paid within one year of the date the Secretary determines that the applicant has failed to begin or complete the period of obligated service.

■ The Government calculates the damages under this algebraic formula at $68,-

685.76 as of the date the petition was filed and at $76,642.95 through March 9, 1989, with interest thereafter at $12.10 per day. The debtor urges the Court to find that the provision for triple payback in addition to interest operates as an unenforceable penalty, not as an enforceable liquidated damages provision. The debtor cites no authority for this position, and his argument is without merit. This Court agrees with the many courts that have thoroughly considered and rejected this identical argument, holding that the treble damages plus interest provision in National Health Service Scholarship Program contracts is a valid liquidated damages clause rather than an unenforceable penalty. *See United States v. Padavano*, 664 F.Supp. 28 (D.Me. 1987); *United States v. Turner*, 660 F.Supp. 1323 (E.D.N.Y.1987); *United States v. Redovan*, 656 F.Supp. 121 (E.D. Pa.1986); *United States v. Haithco*, 644 F.Supp. 63 (W.D.Mich.1986); *United States v. Hayes*, 633 F.Supp. 1183 (M.D.N.C.1986); *United States v. Swanson*, 618 F.Supp. 1231 (D.Mich.1985).

■ The parties agree that the dischargeability of the debt under the 1978 Contract is not governed by 11 U.S.C. § 523(a)(8), but is instead governed by 42 U.S.C. § 254o (d)(3) which provides as follows:

(3) [a]ny obligation of an individual under the Scholarship Program (or a contract thereunder) or the Loan Repayment Program (or a contract thereunder) for payment of damages may be released by a discharge in bankruptcy under title 11 of the United States Code only if such discharge is granted after the expiration of the five-year period beginning on the first date that payment of such damages is required, and only if the bankruptcy court finds that nondischarge of the obligation would be unconscionable.

Under § 254o (d)(3), the obligations under the 1978 Contract may be discharged in bankruptcy only if two conditions are met: (1) the discharge is granted after five years from the date repayment of the loan is scheduled to commence; and (2) the bankruptcy court finds that a refusal to discharge the loan would be unconscionable.

While the parties dispute the date on which repayment of the loan was scheduled to commence, it is fair to say that the first condition has been met. The debtor contends that the date of breach was March 9, 1982 and that the loan was to be paid back one year later, on March 9, 1983, so that more than five years have passed. The Government contends that the date of breach was not until August 26, 1983 and that the loan was to be paid back one year later, on August 26, 1984, so that five years will not pass until August 26, 1989. Thus, even using the Government's later date of breach, the first condition is met unless a discharge in this case could be granted before August 26, 1989.

The timing of the discharge in this case depends on whether this case proceeds under Chapter 11, Chapter 13 or Chapter 7. This case will not continue as a Chapter 11 case. In an Order entered on February 3, 1989 on a motion by the United States Trustee to dismiss this case as a Chapter 11 case, the Court gave the debtor ten days from the date of the Court's ruling in this adversary proceeding to elect to convert this case to one under Chapter 13. The Order further provided that if the debtor did not convert the case to one under Chapter 13 within that ten day period, the case would be converted to a case under Chapter 7 without any further hearing. This case cannot proceed under Chapter 13 since the unsecured debt in this case exceeds the quantitative limits of 11 U.S.C. § 109(e), making this debtor ineligible for Chapter 13 relief. Thus, ten days after the entry of this Order, this case will be converted to a case under Chapter 7.

A discharge in a Chapter 7 case is granted sooner than in Chapter 13 or Chapter 11 cases, but it still could not be granted here before August 26, 1989. Discharge orders are not entered in Chapter 7 cases until it is certain that there are no objections to discharge under 11 U.S.C. § 727, and parties have sixty days after the first date set for the § 341 meeting of creditors to file such objections. Bankruptcy Rule 4004(a);

Bankruptcy Rule 1019(3). The § 341 meeting is scheduled by the United States Trustee but cannot be scheduled less than twenty days after the order for relief. Thus, it is a certainty that even when this case is converted to a Chapter 7 case, the discharge will not be granted until after August 26, 1989. Accordingly, even using the Government's later date of breach, five years will pass before the discharge is granted.

A related issue is whether the Government's request for a determination of nondischargeability under 42 U.S.C. § 254*o* (d)(3) is premature. If the debtor were eligible for Chapter 13 relief and if the debtor converted the case to one under Chapter 13, then the dischargeability determination would not be proper until the discharge was sought, which would not occur until payments under a Chapter 13 plan were completed. *United States v. Lee,* 89 B.R. 250 (N.D.Ga.1987), *aff'd.* 853 F.2d 1547 (11th Cir.1988). *See also In re Owens,* 82 B.R. 960 (Bankr.N.D.Ill.1988) where the court, in a Chapter 13 case involving a National Health Service Corps scholarship, stated: "[t]herefore, the question of whether the Debtor should be discharged from this particular debt will only be of issue if and when the Debtor gets a discharge on completion of her Chapter 13 plan some fifty months or more hence". *Id.* at 964. However, in the case before this Court, the debtor is not eligible for relief under Chapter 13, and pursuant to the Court's Order of February 3, 1989, this case will be converted to a case under Chapter 7. Given the status of the case, a determination on the merits now is appropriate.

■ The second requirement for discharging the obligation under 42 U.S.C. § 254*o* (d)(3) is an explicit finding that a nondischarge of the debtor's obligations under the 1978 Contract would be unconscionable. While the debtor's obligations resulting from the scholarship awards are now in excess of $100,000.00 and while the Court is aware that this will place a heavy financial burden on the debtor, the Court has considered all the facts and circumstances of the case and concludes that the evidence does not support a finding of unconscionability. The unconscionability standard of a similar statute, 42 U.S.C. § 294f(g), has been said to require a higher standard than the finding of undue hardship under 11 U.S.C. § 523(a)(8), and the Court has already found that the debtor has failed to establish undue hardship. *Hines v. United States (In re Hines),* 63 B.R. 731 (Bankr.D.S.D.1986); *see also United States v. Green (In re Green),* 82 B.R. 955, 959 (Bankr.N.D.Ill.1988). Again, there was no evidence that the debtor, his wife or child had any health problems. While it is true that the debtor never completed his residency program and therefore may not have the seemingly unlimited opportunities of some medical doctors, the debtor did obtain his medical degree with the financial assistance of the scholarships, and he is now gainfully employed as a physician earning in the neighborhood of $80,000.00 per year. Finally, the debtor has had repeated opportunities to avoid these repayment obligations by simply performing the obligated service in a health manpower shortage area.

The debtor argues that the Court should consider the effect that fulfilling his service obligation would have on his marriage. The debtor testified that he and his wife had moved from Colorado to Georgia in 1984 to be near his wife's family and that there is a good chance that his marriage would break up if he had to move and take a reduction in pay by fulfilling his service obligation. This factor should not be given much weight in determining whether a nondischarge of the obligation is unconscionable. It is undoubtedly inconvenient for any couple to move to a remote manpower shortage area to fulfill the service obligation. To hold that having an unhappy husband or wife excuses a scholarship recipient from the service obligation would defeat the purpose of these scholarship programs, which is to supply physicians to those areas of the United States where there is a shortage of health care professionals. The Court in *United States v. Haithco,* 644 F.Supp. 63 (W.D.Mich.1986) rejected a similar argument by a nurse, stating "[t]hat she might have found a

service placement in Michigan more convenient in terms to her family, her marriage or her desire to pursue a graduate nursing degree is irrelevant. The NHSC scholarship program is ultimately designed to serve needs larger than the personal needs of the scholarship recipient". *Id.* at 69.

Finally, the debtor argues that the Court should apportion the obligation and hold that the liquidated damages portion of the debt is dischargeable, citing *Rural Kentucky Medical Scholarship Fund, Inc. v. Lipps (In re Lipps)*, 79 B.R. 67 (Bankr.M. D.Fla.1987). However, the *Lipps* case involved a determination under § 523(a)(8), and the obligations under the 1978 Contract are governed by 42 U.S.C. § 254*o* (d)(3). These statutes are materially different in that § 523(a)(8) makes nondischargeable the debt for an educational loan made by a governmental unit, whereas § 254*o* (d)(3) makes nondischargeable any obligation for payment of damages under the scholarship program. The court in *Lipps* determined that only the principal portion of the debt was to repay an "educational loan" and that the liquidated damages did not constitute debt for the "educational loan". The debtor has not cited any authority or presented any facts that would allow the Court to apportion the damages in this case into those that are dischargeable and those that are nondischargeable under 42 U.S.C. § 254*o* (d)(3).

In accordance with the above reasoning, the Government has a total claim against this estate in the amount of $96,975.99 as of the date the petition was filed. This amount includes damages under both the 1977 Contract and the 1978 Contract. The Court further finds that the obligations under both the 1977 Contract and the 1978 Contract are nondischargeable. The Government is entitled to a judgment against the debtor on the claim under the 1977 Contract in an amount equal to $31,-928.02 as of June 8, 1989, with interest accruing at $4.87 per day. With respect to the claims under the 1978 Contract, the Government is entitled to a judgment against the debtor in an amount equal to $77,722.01 as of June 8, 1989, with interest accruing at $12.10 per day.

IT IS SO ORDERED.