Paul A. BUONGIORNO, Jr., Appellee,

v.

Louis W. SULLIVAN, Secretary, United States Department of Health and Human Services

and

United States of America, Appellants.

No. 89–5363.

United States Court of Appeals, District of Columbia Circuit.

Argued May 11, 1990.

Decided Aug. 24, 1990.

---

Robert D. Kamenshine, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and William Kanter, Dept. of Justice, were on the brief, for appellants. R. Craig Lawrence and A. Patricia Frohman, Asst. U.S. Attys., Washington, D.C., also entered appearances, for appellants.

James P. Davenport, Washington, D.C., for appellee.

Before D.H. GINSBURG, SENTELLE, and THOMAS, Circuit Judges.

Opinion for the court filed by Circuit Judge THOMAS.

CLARENCE THOMAS, Circuit Judge:

This case concerns the National Health Service Corps and the rule under which the government decides whether to modify the obligations of someone who has participated in the Corps' scholarship program. We consider here a challenge to the rule on its face, and a challenge to the rule as applied.

I.

A.

The National Health Service Corps (NHSC) exists, in the words of Congress, "to improve the delivery of health services in health manpower shortage areas," 42 U.S.C. § 254d(a)(2), "to rectify," in the words of a recent court decision, "the nation's topological maldistribution of health professionals," *United States v. Beane,* Civ. No. 88–8488, mem. op. at 1, 1990 WL 63603 (E.D.Pa. May 7, 1990).[1] To help "assure [the Corps] an adequate supply of trained physicians, dentists, and nurses,"

---

**1.** The Corps was established on December 31, 1970, when President Nixon signed into law the Emergency Health Personnel Act of 1970, Pub.L. No. 91–623, 84 Stat. 1868, 1868–69; *see also* Emergency Health Personnel Act Amendments of 1972, Pub.L. No. 92–585, 86 Stat. 1290, 1290–95 (amending program); Health Professions Educational Assistance Act of 1976, Pub.L. No. 94–484, 90 Stat. 2243, 2268–90 (same); Om-

nibus Budget Reconciliation Act of 1981, Pub.L. No. 97–35, 97 Stat. 357, 902–13 (same). For a sampling of the legislative history of those statutes, see S.Rep. No. 1062, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin. News 4832; H.R.Rep. No. 266, 94th Cong., 1st Sess. (1975), *reprinted in* 1976 U.S.Code Cong. & Admin.News 4947; and S.Rep. No. 887, 94th Cong., 2d Sess. (1976).

42 U.S.C. § 254*l* (a), Congress created the National Health Service Corps Scholarship Program. *See id.* § 254*l*. The essentials of the program are simple: the government pays for the schooling of future health care providers, and the students promise in return to work after graduation in medically understaffed areas. *See generally United States v. Duffy,* 879 F.2d 192, 193–94 (6th Cir.1989); *Rendleman v. Bowen,* 860 F.2d 1537, 1539–40 (9th Cir.1988).

The particulars of the program are also simple. A student who chooses to participate must sign a contract that conforms to detailed statutory standards. Under an NHSC scholarship contract, the government agrees to pay the student's tuition and expenses and to provide the student with a monthly stipend. 42 U.S.C. § 254*l* (f)(1)(A), (g). The student agrees to remain in good academic standing, to graduate, and, subject to exceptions not germane, to serve a year in the Corps for each year he receives government funding (with at least two years' service required). *Id.* §§ 254*l* (f)(1)(B), 254m; *see also United States v. Duffy,* 879 F.2d at 193 (describing student's options). The statute also mandates that the contract include a clause reciting the damages to which the government is entitled if the program participant breaches. 42 U.S.C. §§ 254*l* (f)(3), 254o. A program participant who refuses to serve in the Corps must pay the government three times the amount awarded under his scholarship, discounted proportionately for months actually served, plus interest. *Id.* § 254o(b)(1)(A).

When Congress created the scholarship program in 1972, it recognized that exceptions to the damages provision might sometimes be appropriate. It therefore included in the statute a provision that reads, after minor changes, as follows:

The Secretary shall by regulation provide for the partial or total waiver or suspension of any obligation of service or payment by an individual under the Scholarship Program ... whenever compliance by the individual is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable.

42 U.S.C. § 254o(d)(2). The same year, the Secretary of Health, Education, and Welfare adopted a rule that currently provides:

In determining whether to waive or suspend any or all of the service or payment obligations of a participant as imposing an undue hardship and being against equity and good conscience, the Secretary ... will consider:

(1) The participant's present financial resources and obligations;

(2) The participant's estimated future financial resources and obligations; and

(3) The extent to which the participant has problems of a personal nature, such as physical or mental disability, [or] terminal illness in the immediate family, which so intrude on the participant's present and future ability to perform as to raise a presumption that the individual will be unable to perform the obligation incurred.

42 C.F.R. § 62.12(d).[2]

### B.

In the spring of 1978, the government awarded a National Health Service Corps scholarship to Paul A. Buongiorno, Jr. The government renewed the scholarship in 1979. Under the terms of the program contract, the government promised to pay Buongiorno's tuition and expenses for the 1978–1979 and 1979–1980 school years at the Georgetown University School of Medicine and to send Buongiorno a monthly stipend. Buongiorno promised to practice for two years in a part of the country lacking sufficient medical personnel. Buongiorno also promised, pursuant to the statutory mandate, that if he "[f]ail[ed] to begin ... the period of obligated service

---

**2.** The rule also provides:

Compliance by a participant with a service or payment obligation will be considered *impossible* if the Secretary determines ... that the participant suffers from a physical or mental disability resulting in the permanent inability of the participant to perform the service or other activities which would be necessary to comply with the obligation.

42 C.F.R. § 62.12(c) (emphasis added).

incurred under this contract," he would reimburse the government "an amount equal to three times the scholarship funds awarded, plus interest." Payments to Buongiorno eventually totaled more than $38,000.

Buongiorno graduated from Georgetown in June 1980. The government then deferred his obligations so that Buongiorno could complete a four year residency at Georgetown in psychiatry. In 1982 Buongiorno's wife injured her knee, aggravating preexistent health problems and leaving her virtually immobile. Local doctors began treating her.

As Buongiorno's residency neared its end, he began to explore the possibility of discharging his program obligations in Washington, D.C. Buongiorno learned that service in a program affiliated with the National Research Service (NRS) qualified for NHSC credit. *See* 42 U.S.C. § 254m(e). In September 1983, Buongiorno applied for an NRS fellowship with the National Institute of Mental Health. The Institute rejected his application the following May.

In December 1984, the NHSC told Buongiorno that it had assigned him to the Indian Health Service and that he would have to practice in Arizona or Oklahoma. Buongiorno promptly applied for a waiver. In a letter to the Corps dated January 30, 1985, Buongiorno described his wife's medical condition and how it affected him. He concluded:

I respectfully suggest that to compel me to comply with the service obligations of the Program would impose an undue hardship on me, and particularly my wife, and further would be against all equity and good conscience.... My ability to perform the obligations as a doctor would be understandably impaired, if relocation was compelled, perhaps to the point where I might not be able to appropriately perform my duties.

The Corps replied in a letter dated March 18, paraphrasing the regulation that governs waiver and asking Buongiorno to submit updated medical documentation from his wife's doctor. By June the Corps still

had not gotten the medical records it had asked for, and on June 11, it declared Buongiorno in default. An August letter told Buongiorno's lawyer that the Corps needed certain information for the waiver decision:

It will be necessary to establish that, as a result of his wife's medical condition, Dr. Buongiorno is unable to fulfill his obligation through service or monetary payment. If Dr. Buongiorno is unable to practice, we will require a statement and clarification. If service would represent a financial hardship, we will request full clarification of his financial status.

Buongiorno sent the government some of the material it was seeking, but in a letter to Buongiorno's lawyer dated December 20, the Corps explained why it needed more.

The information which you have provided does not document a cause and effect relationship between Mrs. Buongiorno's medical condition and her husband's ability to serve his obligation or repay his scholarship debt. The scholarship obligation is Dr. Buongiorno's. Therefore, the critical issue is whether fulfillment of the obligation is unconscionable or constitutes an undue hardship based on Dr. Buongiorno's ability to fulfill his obligation. His wife's medical condition is a factor only because of its effect upon her husband's ability to practice medicine.

The letter noted that Buongiorno "is capable of commanding a salary which will enable him to repay his scholarship debt. No information has been provided to establish his financial inability to comply with the condition of his scholarship contracts." If Buongiorno thought he could qualify for a waiver, the Corps continued, he should submit tax returns, projections of future income, and other financial data. The letter then summarized:

[A] waiver of Dr. Buongiorno's obligation is not possible solely on the basis of Mrs. Buongiorno's medical condition, unless it is proven that: 1) sources of treatment are available to her only in the Washington, D.C. area, ruling out the potential for fulfillment of Dr. Buongiorno's obligation through service; and 2)

Dr. Buongiorno is incapable of discharging his scholarship debt through his earnings as a physician.

In a letter dated March 14, 1986, the Corps told Buongiorno's lawyer that "the information provided for review fails to justify either a medical or financial waiver of Dr. Buongiorno's scholarship obligation. His request is denied." Buongiorno filed a complaint against the Secretary on July 2, 1986, seeking an order that would compel the Secretary to grant Buongiorno his waiver and set aside the Secretary's decision finding him in default. The United States intervened as a defendant and counterclaimed for an amount computed under the liquidated damages provision. The parties next cross-moved for summary judgment. The district court held that material facts were not at issue and that the Secretary's regulation was facially invalid as a matter of law. It therefore entered judgment in favor of Buongiorno. *Buongiorno v. Sullivan,* Civ. No. 86–1867–AER (D.D.C. July 13, 1989). We review the district court's decision de novo, *see, e.g., Shields v. Eli Lilly & Co.,* 895 F.2d 1463, 1465–66 (D.C.Cir.1990), and reverse.

## II.

### A.

■ We begin by considering Buongiorno's facial challenge to the Secretary's rule. Buongiorno argues that the regulation is invalid because it makes the fiscal health of a program participant relevant in all cases to waiver. According to Buongiorno, that feature of the rule reflects impermissible constructions of two separate clauses in the statute. We evaluate Buongiorno's contention under settled principles of law, and for the governing precepts we look, as did the district court, to a familiar mark: *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*

467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See Buongiorno,* Civ. No. 86–1867–AER, mem. op. at 14 (citing *Chevron* ).

When we assess an agency's construction of a law it administers, we consider first the words of the statute. If Congress has "directly spoken to the precise question at issue," *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781, we must honor congressional intent, *id.* at 843, 104 S.Ct. at 2782. But congressional reticence does not give us license to "impose [our] own construction on the statute." *Id.* If Congress has implicitly delegated to an agency the authority to legislate, we must defer to the agency if its interpretation of the statute is "reasonable." *Id.* at 844, 104 S.Ct. at 2782. If, in contrast, Congress has

> explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782.[3]

Cases following *Chevron* confirm that when a statute fits into the last class of the Court's taxonomy, courts concentrate their analysis on *Chevron's* second step after pausing for a moment at the first. *See, e.g., Sullivan v. Zebley,* —— U.S. ——, 110 S.Ct. 885, 890, 107 L.Ed.2d 967 (1990) ("Since the Social Security Act expressly grants the Secretary rulemaking power, 'our review is limited to determining whether the regulations promulgated exceeded the Secretary's statutory authority and whether they are arbitrary and capricious.'") (quoting *Bowen v. Yuckert,* 482 U.S. 137, 145, 107 S.Ct. 2287, 2293, 96 L.Ed.2d 119 (1987), and citing *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82); *see*

---

**3.** *See Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977):

Congress in [a section of the Social Security Act] expressly *delegated* to the Secretary the power to prescribe standards.... In a situation of this kind, Congress entrusts to the Secretary, rather than to the courts, the pri-

mary responsibility for interpreting the statutory term. In exercising that responsibility, the Secretary adopts regulations with legislative effect. A reviewing court is not free to set aside those regulations simply because it would have interpreted the statute in a different manner.

*also Atkins v. Rivera,* 477 U.S. 154, 162, 106 S.Ct. 2456, 2461, 91 L.Ed.2d 131 (1986). When Congress expressly delegates the authority to fill a gap in a statute, Congress speaks, in effect, directly, and says, succinctly, that it wants the agency to annotate its words. Section 254o(d)(2) states that *"[t]he Secretary shall by regulation provide* for the partial or total waiver or suspension of any obligation of service or payment by an individual under the Scholarship Program...." 42 U.S.C. § 254o(d)(2) (emphasis added). Buongiorno has thus challenged a regulation "adopted pursuant to [an] explicit grant of rulemaking authority." *Atkins v. Rivera,* 477 U.S. at 162, 106 S.Ct. at 2461. Under *Chevron,* therefore, we must uphold the agency's challenged rule unless the rule is arbitrary, capricious, or manifestly contrary to the statute. 467 U.S. at 844, 104 S.Ct. at 2782; *see, e.g., Wint v. Yeutter,* 902 F.2d 76, 81 (D.C.Cir.1990).

Buongiorno's attack on the Secretary's rule comprises two arguments, distinct but intimately related. Buongiorno first accuses the Secretary of contravening express statutory language. The statute directs the Secretary to provide by regulation "for the partial or total waiver ... of any obligation of service or payment ..." 42 U.S.C. § 254o(d)(2). Buongiorno reads those words to mean that the Secretary must engage in a two-stage analysis of waiver requests. A breaching participant, according to Buongiorno, should first be able to apply for a "waiver ... of any obligation of service," and, if rejected for a service waiver, should then be able to seek a "waiver ... of any obligation of ... payment." Only in the payment waiver proceeding could the Secretary consider a participant's financial present and prospects. Because, in Buongiorno's view, the Secretary has conflated the separate stages of waiver analysis, the rule governing waiver cannot be squared with the statute.

Buongiorno also maintains that the regulation flouts Congress's implied intent. Like Buongiorno's first attack on the rule, this one is grounded in Buongiorno's understanding of the statutory clause governing damages, 42 U.S.C. § 254o(b)(1)(A). According to Buongiorno, Congress meant for a participant's state of mind to determine whether his fiscal health should come into play in a waiver decision, even if there were but one obligation of "service or payment"—as opposed to alternative obligations of "service, or payment"—to be waived. As Buongiorno understands the statute, Congress included a treble damages clause to punish those who might choose not to serve in the Corps, and to frighten away those who might find not serving an attractive option.[4] The statute directs the Secretary to provide for waiver "whenever compliance by the individual ... would involve extreme hardship to the individual." 42 U.S.C. § 254o(d)(2). If the treble damages provision is meant to punish and deter, Buongiorno continues, Congress must have wanted the Secretary to distinguish between the willfully culpable and those whose "non-service is not volitional." Brief for Appellee at 23. It follows, according to Buongiorno, that the Secretary may not consider a participant's financial status unless his failure to serve evinces willful culpability.

The Secretary construes the statute differently. Conceding that the prospect of paying treble damages probably has deterred prospective breachers, the Secretary points out that treble damages also compensate the government for its contract losses. As Justice Douglas explained in *Priebe & Sons, Inc. v. United States,* 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947), " 'liquidated damages' provisions in contracts [reflect] fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract.... They serve a particularly useful function when damages are uncertain in

---

**4.** Buongiorno cites several snippets of legislative history to bolster his reading. *E.g.,* S.Rep. No. 887, 94th Cong., 2d Sess. 118–19 (1976) (chart contrasting "penalty provisions" of different versions of bill); *Health Manpower Legislation, 1975: Hearings on S. 989 Before the Subcomm. on Health of the Senate Comm. on Labor &*

*Public Welfare,* 93d Cong., 2d Sess. 2017 (1975) (damages provision "essentially punitive") (statement of Tom E. Nesbitt of American Medical Association, opposing legislation to triple amount to be repaid by program participant who does not serve in NHSC).

nature or amount or [are] unmeasurable." When a program participant breaks his promise to serve, the government loses the benefit of what it bargained for: medical care in places that need it. Those efforts, moreover, are difficult to value. *See United States v. Swanson,* 618 F.Supp. 1231, 1243–44 (E.D.Mich.1985). According to the Secretary, Congress thus chose to measure damages in an NHSC contract the easy, and reasonable, way, by tripling the amount it had spent on a program participant's education—a sum that might approximate the market value of the recipient's services.[5] The Secretary then points out that a participant is statutorily, and contractually, bound to pay the government liquidated damages if he fails to begin service "for any reason." 42 U.S.C. § 254o(b)(1)(A). Congress provided for the waiver of a participant's obligations only when compliance "would involve extreme hardship" and enforcement "would be unconscionable." *Id.* § 254o(d)(2). It follows, according to the Secretary, that the criteria for waiver are not satisfied unless a program participant who will not serve shows that he cannot afford to repay the government for three times the value of his services.

Were we entitled to choose between the parties' positions, we could proceed to list each position's merits and demerits, and we might go on to decide that Buongiorno has interpreted the statute more to our liking. *Chevron,* however, tells us to gauge the Secretary's interpretation by its statutory parent, and not to contrast it with an interpretive rival. Having held the Secretary's rule up to the statute that directed the Secretary to promulgate it, we conclude that the rule withstands examination under *Chevron.* Congress made clear "in the strongest possible terms that it [did] not view the National Health Service Corps scholarship program as a mechanism solely intended to subsidize health professional education." S.Rep. No. 887, 94th Cong., 2d Sess. 201 (1976), *cited in Buongiorno,* Civ.

No. 86–1867–AER, mem. op. at 8. The Secretary decided that its waiver rule should help ensure that the government got what it had paid for. Whether or not the Secretary's interpretation is " 'particularly compelling,' " we hold that it is not " 'patently inconsistent with the statutory scheme.' " *Continental Air Lines v. Department of Transp.,* 843 F.2d 1444, 1452 (D.C.Cir.1988) (quoting *Rettig v. Pension Benefit Guarantee Corp.,* 744 F.2d 133, 152 (D.C.Cir.1984)). That is all that *Chevron* requires.

### B.

 We turn finally to Buongiorno's argument that the Secretary arbitrarily and capriciously refused to release Buongiorno from his scholarship obligations. *See* 5 U.S.C. § 706(2)(A). Having struck down the waiver regulation on its face, the district court did not reach Buongiorno's challenge to the rule as applied. We therefore do not reach Buongiorno's as-applied challenge in this appeal: having concluded that the rule is valid on its face, we leave it for the district court to determine on remand whether, in light of Buongiorno's repeated refusal to submit the financial data necessary for the resolution of his waiver application, " 'the [Secretary's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Community for Creative Non–Violence v. Lujan,* 908 F.2d 992, 995 (D.C.Cir.1990) (quoting *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983)).

\*　　\*　　\*　　\*　　\*　　\*

We reverse the decision of the district court and remand this case for further proceedings consistent with this opinion.

*It is so ordered.*

---

**5.** Courts have unanimously upheld the liquidated damages provisions in NHSC contracts against challenges that the provisions were penalties. *See United States v. Padavano,* 664 F.Supp. 28, 30 (D.Me.1987); *United States v. Redovan,* 656 F.Supp. 121, 128 (E.D.Pa.1986), *aff'd mem.,* 826 F.2d 1057 (3d Cir.1987); *United States v. Haithco,* 644 F.Supp. 63, 68–69 (W.D. Mich.1986); *United States v. Hayes,* 633 F.Supp. 1183, 1185–86 (M.D.N.C.1986); *United States v. Swanson,* 618 F.Supp. 1231, 1243 (E.D.Mich. 1985).